Argued November 24, 1953; reargued March 31, reversed April 14,
petition for rehearing denied September 15, 1954, appeal to
United States Supreme Court, order of United
State Supreme Court dismissing appeal
May 27, 1955

## TERRY *v.* CITY OF PORTLAND ET AL.

269 P. 2d 544

*David Fain,* of Portland, argued the cause for respondent.

*Alexander G. Brown,* City Attorney, and *Marian C. Rushing,* Chief Deputy City Attorney, of Portland, argued the cause for appellants.

Before LATOURETTE, Chief Justice, and ROSSMAN, LUSK, BRAND, TOOZE and PERRY, Justices, November 24, 1953.

ROSSMAN, J.

This is an appeal from a declaratory judgment and decree of the Circuit Court for Multnomah County which ruled that Ordinance No. 94553 of the city of Portland is invalid, and which enjoined the officials of that city from enforcing the ordinance. Following is a copy of the latter:

"An Ordinance amending Article II of Ordinance No. 76339 (Police Code) by adding a new section so as to prohibit ownership, maintenance, use, play, etc., of any coin-in-the-slot device, excluding however music devices, certain types of vending machines and games or amusement devices other than pinball machines or digger or grabbing devices where no element of chance, bonus or prize is inherent in such game or device, and declaring an emergency.

"The City of Portland does ordain as follows:

"Section 1. The Council finds that coin-in-the-slot operated devices of various types present problems of law enforcement since such devices may be adapted or misused for the purpose of conducting lotteries or gambling; that the prohibition of play by minors of such devices presents difficult policing problems; that therefore all such devices with certain specific exceptions should be prohibited within the City regardless of any element of skill involved, and regardless of any intention to use such device for amusement only; now, therefore, Article II of Ordinance No. 76339 (Police Code), hereby is amended by adding thereto a new section to be entitled, numbered and to read as follows:

"Section 16-1129 COIN-IN-THE-SLOT DEVICES

"It is hereby unlawful for any person to own, maintain, control, operate, use or play or permit to be owned, maintained, controlled, operated, used or played either as operator, user or player or as owner, proprietor, lessee, employe or agent, any

coin-in-the-slot-operated mechanical game or device or other device of like character regardless of whether such game or device be operated or played for a profit or prize or for further operation or play, or for the display or exercise of skill or for amusement, and whether or not any element of skill is involved in any way in said operation, use or play. This section shall not be deemed to apply to music devices or vending machines where no element of chance, bonus or prize is involved in such vending, whether such vending machine vends merchandise, commodities or special services or privileges, nor to games or amusement devices other than pinball games or digger or grabbing devices, where no element of chance, bonus or price is inherent in such game or device.

"Section 2. Inasmuch as this ordinance is necessary for the immediate preservation of the public health, peace and safety of the City of Portland in this: That law enforcement should be aided and facilitated in accordance with the provisions hereof in order to alleviate policing problems; therefore an emergency hereby is declared to exist and this ordinance shall be in force and effect from and after its passage by the Council."

Upon this appeal the plaintiff does not claim that the ordinance contravenes any principle of constitutional law, but argues that the ordinance conflicts with Oregon Laws 1943, ch 220, as amended by Oregon Laws 1945, ch 255, and Oregon Laws 1947, ch 502. The statute in its amended form is §§ 320.010 through 320.990, ORS. Specifically, the plaintiff asserts that when the legislature adopted the measure it "preempted the field of legislating on the lawfulness or unlawfulness of coin-in-the-slot-operated pinball and similar games and devices."

Section 1 of the act follows:

"There hereby is imposed on every coin-in-the-slot-operated music and amusement device of every

description or designation, a privilege tax. The amount of such tax shall be as follows:

"(a) On every coin-in-the-slot-operated mechanical game or device designed to be played for amusement, other than music, only and to return to the player thereof no coins, tokens or merchandise, an annual tax of fifty dollars ($50) each."

Section 2 excepts vending machines and devices used by public utilities to collect fares and rates; § 3 specifies what constitutes the tax year; § 4 requires the owner of the machine to pay the tax and requires him to designate the premises where the machine will be displayed; § 5 provides for a receipt to be issued to the owner upon payment of the tax; § 6 renders the display of the machine unlawful, unless the receipt issued upon payment is affixed to the device or conspicuously posted nearby; §§ 7 and 8 were repealed in view of the holding in *Fox v. Galloway,* 174 Or 339, 148 P2d 922; § 9 directs that the funds yielded by the tax shall be apportioned 60 per cent to the state public assistance fund and 40 per cent to the counties; § 10 renders violation of the act a misdemeanor; § 11 provides that alteration of the receipt issued by the state is forgery and that justice and district courts shall have concurrent jurisdiction with the circuit courts to enforce the act; § 12 provides that an attempt to evade payment of the tax by affixing to the machine something resembling the state receipt is a crime; § 13 gives the Tax Commission power to make rules for the administration of the act and gives their agents power of police officers; § 14 requires all law enforcement officers to enforce the act; § 15 imposes the tax in addition to any other tax that may be exacted by any municipality or the United States; and § 16 provides that the act shall not be construed as legalizing machines in violation of any law of the state.

Stripped of averments immaterial to this appeal, the complaint alleged that the plaintiff, for more than fifteen years,

> "has been engaged in the business of owning, selling, leasing and renting certain amusement devices within the City of Portland and State of Oregon, constructed and designed for manual operation by the player, following the insertion of a coin therein, as a game for the player's amusement and pleasure, and which said devices pay no money, merchandise or article of value to the player as a prize, and which are within and subject to the provisions of Chapter 220, Oregon Laws for the year 1943, as amended by Oregon Laws for 1945, and 1947 * * *."

According to the complaint, the plaintiff has paid to the state the license fees required of him by the statutes. The same pleading states that the value of the plaintiff's devices is $100,000 and that there were in Portland at the time the suit was filed "in excess of 1,000 amusement devices licensed by the state statute." The plaintiff avers that the city's officials contend that his devices "are within and subject to the provisions of said City of Portland Ordinance No. 94553, and the ownership, maintenance, control, operation, use or play thereof is prohibited thereby and rendered unlawful." The only claim that the ordinance is unlawful, which has been urged upon appeal, is expressed in the complaint in this language:

> "That said Chapter 220 of the Oregon Laws of 1943, as amended, is a law of general application throughout the entire State of Oregon, and said City of Portland Ordinance No. 94553 is in conflict therewith; that said Ordinance purports to prohibit and render illegal that which is allowed, approved and licensed by the State of Oregon; * * * that said Ordinance is inconsistent with said state statute and is in contravention thereof; that the State of Oregon has preempted the field

of law covered by said statute and the ordinance and the City of Portland has no power or authority to prohibit or ban what is privileged and permitted by said statute, * * *.''

Following the filing of the complaint, the defendants, who are the city and its officials, moved for the entry of a declaratory judgment in their favor. The motion was heard by a panel of three judges who, with one of their number [Honorable MacCormac Snow] dissenting, held that the ordinance was invalid on the ground that the 1943 act had preempted the regulation of devices of the kind which the plaintiff owned. The city appealed.

In this court, the city contends that the ordinance is a valid exercise of the police power, and that Oregon Laws 1943, ch 220, does not preempt the regulation of machines of the kind which it describes.

It is plain that the ordinance is directed at machines, not only of a gambling or lottery nature, but also at machines that do not provide pay-off or free play. We assume, without so deciding, that the plaintiff's machines are of the latter kind.

Disregarding for the time the issue of preemption, we shall determine whether or not the ordinance is valid as an exercise of the police power.

Section 2-105(a) and subsections 1 and 2 of the Legislative Charter of the City of Portland (1942 compilation) provide:

"The Council has power and authority subject to the provisions, limitations and restriction in this charter contained:

"1. To exercise within the limits of the city of Portland all the powers commonly known as the police power to the same extent as the state of Oregon has or could exercise said power within said limits.

"2. To make and enforce within the limits of the city all necessary water, local, police and sanitary laws and regulations."

Section 2-120 of the charter says:

"Enumeration of Powers Not a Limitation. The foregoing or other enumeration of particular powers granted to the council in this charter shall not be construed to impair any general grant of power herein contained, nor to limit any such general grant to powers of the same class or classes as those so enumerated."

■ Obviously, the police power authorizes the prohibition of gambling. Therefore, if the machines which the plaintiff possesses can properly be deemed gambling devices, the police power can be employed for their elimination.

This court has not previously been required to determine the validity of legislation of this character. *State v. Fuller,* 164 Or 383, 101 P2d 1010, affirmed the dismissal of an information charging violation of a lottery statute where the machines were of a pinball type providing no "pay-off" or "free play". The holding was merely that the machines were not in violation of any existing statute. The question now before us is whether the police power may be employed for the prohibition of such a machine.

*Murphy v. California,* 225 US 623, 56 L ed 1229, 32 S Ct 697, is pertinent to the inquiry under way. The city of South Pasadena, California, in the exercise of its police power, passed an ordinance which prohibited all persons from maintaining a room where pool or billiard tables were kept, but permitted hotels, under the conditions specified in the ordinance, to provide such a room for the use of their guests. The plaintiff, who operated a poolroom which was not connected with a hotel, was convicted of the violation

of the ordinance. Before the United States Supreme Court he contended that the ordinance violated the Fourteenth Amendment. In rejecting the contention, the court said:

"The Fourteenth Amendment protects the citizen in his right to engage in any lawful business, but it does not prevent legislation intended to regulate useful occupations which, because of their nature or location, may prove injurious or offensive to the public. Neither does it prevent a municipality from prohibiting any business which is inherently vicious and harmful. But, between the useful business which may be regulated and the vicious business which can be prohibited lie many non-useful occupations, which may, or may not be harmful to the public, according to local conditions, or the manner in which they are conducted.

"Playing at billiards is a lawful amusement; and keeping a billiard hall is not, as held by the Supreme Court of California on plaintiff's application for *habeas corpus*, a nuisance *per se*. But it may become such; and the regulation or prohibition need not be postponed until the evil has become flagrant.

"That the keeping of a billiard hall has a harmful tendency is a fact requiring no proof, and incapable of being controverted by the testimony of the plaintiff that his business was lawfully conducted, free from gaming or anything which could affect the morality of the community or of his patrons. The fact that there had been no disorder or open violation of the law does not prevent the municipal authorities from taking legislative notice of the idleness and other evils which result from the maintenance of a resort where it is the business of one to stimulate others to play beyond what is proper for legitimate recreation. The ordinance is not aimed at the game but at the place; and where, in the exercise of the police power, the municipal authorities determine that the keeping of such resorts should be prohibited,

the courts cannot go behind their finding and in-
quire into local conditions; * * *.''

"Innocent" pinball devices have been before the
courts many times. Many cases arose under statutes
which, in prohibiting the possession of gambling
machines, employed language broader than our own.
The reasoning and observations in which the courts
engaged in those cases as to the nature, prevalence
and effect of machines lacking a pay-off or free play
is enlightening upon the question of the validity of
legislation prohibiting the possession of such machines.

*Sternall v. Strand*, 76 Cal App2d 432, 172 P2d 921,
represented an attempt by the plaintiff to recover
numerous pinball devices that had been seized by the
local sheriff. The sheriff contended that the plaintiff
held the machines in violation of a county ordinance
supplemental to state legislation. Among the seized
machines were two which provided neither pay-off
nor free play and six which issued no prizes but had
mechanism which could award free play. In affirm-
ing the decision for the defendant sheriff, the court,
in referring to the eight machines which we just identi-
fied, said:

> "The general situation thus described is well
> known throughout this state. If it be assumed that
> we may not take judicial notice of these things and
> of the attendant evils which have given rise to a
> situation which is a serious reflection on the law,
> on public officers and on good government, there
> is nothing in the record before us which compels
> us to hold that the board of supervisors was not
> cognizant of conditions in San Diego County which
> reasonably called for action of this nature, or that
> the board acted beyond what was reasonable in
> view of conditions either known or believed by it
> to require action, even to the extent of prohibiting
> the mere possession of machines and devices which

can, and are, so easily and frequently changed from an ostensibly innocent use to one which is not only evil in itself but which, as a practical matter, encourages and leads to many other evils, against all of which the board was attempting to guard. It is the usual rule that a court will not hold an ordinance void as unreasonable where there is room for a fair difference of opinion on the question, and that the question as to the reasonableness of an ordinance is primarily one for the legislative authority. * * *

"* * * In view of the prevalence of these devices, past experience with the ingenuity of the makers and operators of such devices in adapting them to law evasion, their tendency and adaptability to developing and fostering the gambling instinct, and their well known temptation to school children and minors, it would be a perversion of justice and of the power of the courts to hold that such devices were merely laudable instruments of entertainment, and that an ordinance forbidding the possession of such machines is unreasonable, unconnected with any lawful purpose, and an arbitrary and unwarranted interference with legitimate and useful business and not within the broad scope of the police powers which, in so many other instances, have been invoked to regulate and prevent less widespread and less serious evils. What we have said applies to the two machines in the third group as well as to the six machines in the second group. Any difference between the two types of devices is one of degree only. The score indicated on the machine may well be taken as a token or memorandum which may be exchanged for something else. The possibility and probability of abuse and improper use is equally present in both instances.

"* * * The reasons for the adoption of the ordinance in this form and the purposes sought to be accomplished thereby appear reasonable and sufficient, and it cannot be held, under the circumstances, that this ordinance is unconstitutional as being one not within the scope of the police powers."

The following cited decisions reached results similar to that in the opinion from which we just quoted: *Alexander v. Hannicutt,* 196 SC 364, 13 SE2d 630; *State v. One 5¢ Fifth Inning Base Ball Machine,* 241 Ala 455, 3 So2d 27; *Baker v. City of La Fayette,* 202 Ga 666, 44 SE2d 255; *Eccles v. Stone,* 134 Fla 113, 183 So 628; *Silfen v. City of Chicago,* 299 Ill App 117, 19 NE2d 640; *People v. One Pinball Machine,* 316 Ill App 161, 44 NE2d 950.

*State v. One 5¢ Fifth Inning Base Ball Machine,* supra, said:

"It is, in our opinion, a machine which can be used as a game of chance. The act did not contemplate that it must be a machine which gives a reward or in the operation of which the proprietor offers an inducement. It is open to use as a game of chance for two or more customers or members of the public who operate the machine and who are tempted to gamble on the result of the game. This was clearly one of the evils at which the act was aimed."

We take the following from *People v. One Pinball Machine,* supra:

"It is also common knowledge that the machine itself is sometimes used by players to determine who shall buy the drinks or pay for refreshments, cigars or lunch, and when so used it is a gambling device within the meaning of the statute. The fact that there is no testimony in this case that the machine in controversy was being so operated is not the test of whether it is a gambling device. The record shows its mechanical features are similar to the common run of pinball machines, and the result of playing it has the same or a comparable element of chance in the score made as those in general use. Their common use as gambling device is what condemns them."

■ We do not believe that the plaintiff denies that the police power can legally prohibit the possession

of devices of the kind described in the challenged ordinance. His brief, referring to the city, says: "But it had the power to authorize or prohibit pinball machines for amusement purposes upon such conditions as it determined." We interpret that statement as an admission by the plaintiff that the city's police power authorized the city to adopt the attacked prohibitory ordinance; provided, of course, that the claim of preemption did not deny the city the right to take that course.

We are impressed with the reasoning and analyses set forth in the decisions of the other courts from which we quoted in preceding paragraphs of this opinion.

It will be recalled that one section of the challenged ordinance says:

> "The Council finds that coin-in-the-slot operated devices of various types present problems of law enforcement since such devices may be adapted or misused for the purpose of conducting lotteries or gambling; that the prohibition of play by minors of such devices presents difficult policing problems; that therefore all such devices with certain specific exceptions should be prohibited within the City regardless of any element of skill involved, and regardless of any intention to use such device for amusement only; * * *."

Since we cannot say that the finding is erroneous, we have no right to disregard it. If authority is needed to justify that statement, we cite *Murphy v. California,* supra. It will be noticed that the council's finding sets forth facts similar to those of which the California and Illinois courts took judicial notice. The council's finding requires us to deem that machines, such as the plaintiff possesses, can readily be used for gambling purposes and that players use them for such

purposes. The city's police power authorizes it to prohibit gambling. In *Enloe v. Lawson*, 146 Or 621, 31 P2d 171, this court said:

> "It is characteristic of the methods of the police power that it attacks the evil at a stage previous to its actual appearance. Therefore, it was appropriate for the city council, by ordinance, to prohibit the possession of money slot machines as gambling devices."

It is our belief that unless the plaintiff's contentions that the state has preempted the regulation of machines of the kind owned by the plaintiff are sustained, the city's ordinance is valid. We shall now consider the issue of preemption.

In submitting his contention that the state has preempted the regulation of coin-in-the-slot-operated amusement devices, the plaintiff argues that when an owner of such a device pays the state tax commission the privilege tax enacted by Oregon Laws 1943, ch 220, § 1(a), he gains a right to posses and enjoy his machine for the succeeding twelve-month period and that, accordingly, no municipality can deprive him of the purported right. The part of the plaintiff's brief which epitomizes his contention is the following:

> "Our position on this appeal is that the Ordinance No. 94553 infringes the spirit of the state law, is repugnant to the general policy of the state, and attempts to completely prohibit what the state permits and authorizes."

■ The following statement of the legal principles which govern preemption is taken from 37 Am Jur, Municipal Corporations, § 165, p 787, and will suffice for present purposes:

> "It is a fundamental principle that municipal ordinances are inferior in status and subordinate to the laws of the state. An ordinance in conflict with a state law of general character and state-

wide application is universally held to be invalid. The principle is frequently expressed in the declaration that municipal authorities, under a general grant of power, cannot adopt ordinances which infringe the spirit of a state law or are repugnant to the general policy of the state. Applying the principle specifically, it has often been held that a municipality cannot lawfully forbid what the legislature has expressly licensed, authorized, permitted or required, or authorize what the legislature has expressly forbidden. Difficulty arises in applying these principles to the facts of particular cases. The limit of municipal authority has never been so clearly and accurately defined as to enable the courts to say readily when it has been overstepped. Some courts have, nevertheless, laid down a criterion for the determination of existence of a conflict. In final analysis, this test is little more than factual application of the principle involved in the cases, but is helpful in many instances. It has been held that in determining whether the provisions of a municipal ordinance conflict with a statute covering the same subject, the test is whether the ordinance prohibits an act which the statute permits, or permits an act which the statute prohibits.

"* * * Thus, where both an ordinance and a statute are prohibitory and the only difference between them is that the ordinance goes further in its prohibition, but not counter to the prohibition under the statute, and the municipality does not attempt to authorize by the ordinance what the legislature has forbidden or forbid what the legislature has expressly licensed, authorized, or required, there is nothing contradictory between the provisions of the statute and the ordinance because of which they cannot coexist and be effective."

The plaintiff argues, as we have indicated, that the enactment of the 1943 measure preempted for the state pinball machine regulation. It will be observed that the state went no further through the enactment of its measure than to impose upon each owner a

privilege tax gauged in amount according to the number of machines he possesses; that is, for each machine the act requires him to pay the sum of $50 annually. *Fox v. Galloway*, supra, held that the tax imposed by the act is a privilege tax rather than a property tax. Its words are:

"Chapter 220, supra, imposes not a property tax, but a privilege tax upon the right to operate or display for operation a coin-in-the-slot mechanical device such as therein designated; and payment of the tax is made a condition to the exercise of such right: * * *."

The ancillary sections of the act are concerned only with the collection of the tax.

No clause of the statute under review expressly purports to remove coin-operated devices of the kind described in the ordinance from regulation by municipalities. If preemption on the part of the state exists, it must be found in implication. Sections 15 and 16 recognize that when the legislature adopted the measure all had not been done and said concerning coin-operated devices that could be done and said. Something was left undone, as § 15 at least indicates, which cities were authorized to do. If the statute were truly preemptory, it surely would not have authorized municipalities to impose upon the devices additional taxes and fees. Interference of that kind would not be tolerated. Taxes and fees, if sufficiently burdensome, as experience has demonstrated, can be almost as effective in suppression as laws which are outright prohibitory. However, before reaching a final conclusion, we will consider other phases of the 1943 act.

We will be in a better position to resolve the issue submitted by the plaintiff if first we determine whether the legislative enactment stems from the state's police power or its tax power. By reverting to the act, it

will be noticed that anyone who owns a machine, by merely paying the tax, squares his account with the state and can go on his way. So far as this statute is concerned, the state's interest in the machines and their owners is limited to the matter of receiving from each owner $50 for each machine he possesses. When the tax has been paid, the state has no further interest in either the owner or his machine for the next twelve months.

The act contains no passage whereby the Tax Commission [it being the agency to which the tax is payable] may exercise discretion and refuse to accept payment of the tax from those whom it has reason to believe will misuse their machines or place them in locations clearly undesirable, as, for example, next door to a schoolhouse. Likewise, the act contains no provision requiring a machine owner to supply information about himself so that the Tax Commission may know whether or not the would-be taxpayer will exercise proper supervision over the operation of his machines and conduct his place of business in obedience to our laws. No limitation is imposed by the act upon the number of machines any owner may operate. Regulations adopted under the police power are frequently concerned with the applicant and his reliability, but those enacted under the taxing power generally deem the character of the taxpayer immaterial. Measures which have their source in the police power display a continuing interest in the regulated place of business and in its proprietor, but those which stem from the taxing power cease their interest in the taxpayer when payment of the tax has been discharged. Accordingly, the absence of any requirement in the 1943 statute that a would-be taxpayer must disclose information about himself, such as, for example, whether or not he was ever convicted of a violation of a statute con-

cerned with gambling, lotteries or coin-operated machines, is worthy of consideration.

Enactments which have their seat in the police power and others which emanate from the taxing power sometimes achieve a common purpose notwithstanding the fact that those which stem from the police power regulate or prohibit while those which come from the taxing power in many instances do nothing except provide money for the public treasury. However, it not infrequently happens that a taxing act, especially if its exaction is burdensome, yields for the public treasury not only a generous sum of money, but also has a suppressive effect similar to that which police measures are designed to achieve.

It is common to find in measures enacted under the police power many regulations which, if violated, subject the offender to punishment, but, generally, taxing legislation permits of only one violation, that is, nonpayment of the tax. The 1943 act can be violated only through failure to pay the tax. In making that statement, we have not overlooked the ancillary provisions of the act which are designed to facilitate collection of the tax. Violation of them is tantamount to nonpayment.

We will presently return to the above considerations which have enlisted our interest, but before going further with them we will consider other phases of the 1943 legislation.

The 1943 measure is by no means the only act enacted by our legislature concerning coin-in-the-slot devices. Section 23-1001, OCLA, which gives effect to Art. XV, § 4, Oregon Constitution, renders it unlawful for anyone to set up or operate a lottery. Section 29-928, OCLA, provides that it shall be a misdemeanor for anyone to play or operate for money

or things of value any game played with cards, dice or other devices. Section 23-935 et seq, OCLA, renders unlawful the possession or operation of slot machines which provide pay-offs. Section 23-939, OCLA, prohibits the possession and operation of slot machines, dart games and pinball games when played for a "profit". It is seen that the 1943 measure, upon which the plaintiff relies to support his contention of preemption, fails to go as far as any of those four statutes, and that the city's attacked ordinance, like the four statutes, is a prohibitory measure.

In *United States v. Kehriger,* 345 US 22, a statute which levied a tax on persons engaged in the business of accepting wagers was sustained as valid. The words of the act were these: "There shall be imposed on wagers, as defined in subsection (b) an excise tax equal to 10 per centum of the amount thereof." The act required persons engaged in wagering to register with the Collector of Internal Revenue. The validity of the act was challenged on two fronts. The first was a contention that Congress, under the pretense of exercising its power to tax, attempted to penalize gambling and thus infringed upon the police power of the states. The second was that the registry requirement violated the privilege against self-incrimination. In sustaining the act, the court said:

"* * * The precedents are many upholding taxes similar to this wagering tax as a proper exercise of the federal taxing power. In the *License Tax Cases,* 5 Wall. 462, the controversy arose out of indictments for selling lottery tickets and retaining liquor in various states without having first obtained and paid for a license under the Internal Revenue Act of Congress. The objecting taxpayers urged that Congress could not constitutionally tax or regulate activities carried on within a state. P. 470. The Court pointed out that Congress had 'no power of regulation nor any direct control' (5 Wall.,

at 470, 471) over the business there involved. The Court said that, if the licenses were to be regarded as by themselves giving authority to carry on the licensed business, it might be impossible to reconcile the granting of them with the Constitution. P. 471.

" 'But it is not necessary to regard these laws as giving such authority. So far as they relate to trade within State limits, they give none, and can give none. They simply express the purpose of the government not to interfere by penal proceedings with the trade nominally licensed, if the required taxes are paid. The power to tax is not questioned, nor the power to impose penalties for nonpayment of taxes. The granting of a license, therefore, must be regarded as nothing more than a mere form of imposing a tax, and of implying nothing except that the licensee shall be subject to no penalties under national law, if he pays it.' *Id.*, at 471.

"Appellee would have us say that, because there is legislative history indicating a congressional motive to suppress wagering, this tax is not a proper exercise of such taxing power. In the *License Tax Cases, supra,* it was admitted that the federal license 'discouraged' the activities. The intent to curtain and hinder, as well as tax, was also manifest in the following cases, and in each of them the tax was upheld: *Veazie Bank* v. *Fenno,* 8 Wall. 533 (tax on paper money issued by state banks; *McCray* v. *United States,* 195 U. S. 27, 59 (tax on colored oleomargarine); *United States* v. *Doremus,* 249 U. S. 86, and *Nigro* v. *United States,* 276 U. S. 332 (tax on narcotics); *Sonzinsky* v. *United States,* 300 U. S. 506 (tax on firearms); *United States* v. *Sanchez,* 340 U. S. 42 (tax on marihuana).

"It is conceded that a federal excise tax does not cease to be valid merely because it discourages or deters the activities taxed."

See, to like effect, *Irvine v. People of the State of California,* 347 US 128, 74 S Ct 381, and *United States v. Kahriger* (C.A. 3rd) 210 Fed 2d 565.

The effect of the Prohibition Amendment and of the Volstead Act upon the government's revenue laws was before the court in *United States v. Yuginovich,* 256 US 450, 65 L ed 1043, 41 S Ct 551, resulting in this pronouncement:

"That Congress may under the broad authority of the taxing power tax intoxicating liquors notwithstanding their production is prohibited and punished, we have no question."

■ An occupation tax may be enacted even from those whose activities are unlawful. Speaking of oil production in violation of law, *State v. Humphrey* (Texas), 159 SW2d 162, said:

"Whether it was produced lawfully or in an unlawful manner makes no difference insofar as liability for the tax is concerned. In 4 Cooley on Taxation, 4th ed 3397, it is said: 'An occupation tax is collectible without regard of public regulations as to license. It is no defense to an action to collect a privilege tax that the business upon which the tax is assessed is illegal.' "

We have taken notice of those decisions because we believe that through reasoning by analogy their holdings appear to warrant a belief that a tax in a substantial sum which is imposed upon those who are engaged in nonuseful activities is more likely to have its source in the tax power than in the police power. Frequently, as an occupation becomes less and less useful, the inclination increased to wring from it an even larger contribution for the public treasury. Payments made under such enactments yield no rights and secure no licenses. Payments under such circumstances merely square the individual's financial obligation with the taxing power. The individual obtains a receipt and nothing else.

Even though a measure which imposes a tax terms

the latter a "license tax", it may develop upon analysis of the tax measure that the latter grants no license and does nothing except to exact from the persons under the act payment of a sum of money. Illustrations are afforded in *Abraham v. City of Roseburg,* 55 Or 359, 105 P 401, and *Lent v. Portland,* 42 Or 488, 71 P 645. Each of those decisions sustained the validity of city ordinances which imposed "license" taxes upon attorneys. Obviously, a city cannot license attorneys. The power to grant licenses to those who shall practice in the courts is possessed by the courts and not even by the legislative assembly. Accordingly, the exaction made by the municipal ordinances which were sustained in those two cases stemmed from the tax power. The attorney, upon payment of the tax, received a receipt, not a license.

■ Likewise, even though a levy is made under a general designation as a tax, it may, in fact, be enacted under the police power of the state. Thus, in *State v. Anderson,* 144 Tenn 564, 234 SW 768, 19 ALR 180, a divided court held that a statute which exacted of all owners of dogs a fee, described in the act as "an annual license fee", was not a tax measure but a regulation stemming from the police power of the state. The title of the act was:

> "A Bill to Be Entitled, 'An Act to Regulate the Owning, Keeping, or Harboring of Dogs, So as to Protect The Safety of the People and of Property; to Provide a License Fee to Be Paid for Each Dog Owned, Kept, or Harbored in This State, and to Provide for the Disposition of Such Fees; to Provide Penalties for the Failure of Certain Officials to Enforce This Act, and to Provide Penalties for a Violation of the Provisions of This Act,' "

The act contained extensive provisions which were designed to assure payment of the tax by owners of

dogs, and others which, after requiring the proceeds of the tax to be transferred to a fund entitled the ''sheep fund'', outlined the manner for using the fund for the compensation of those whose sheep were killed or injured by dogs. The annual balances left in the fund after payments had been made to sheep owners became a part of the school fund. The majority of the court, in holding that the act was a police measure, said:

> ''The act in question was passed by the legislature to regulate the keeping of dogs, because that animal is regarded as dangerous to the safety of persons and property, owing to their vicious propensities, and their being subject to a contagious malady known as hydrophobia. In regulating such a dangerous agency, the levying of a license fee or tax is not only intended to cover the cost of issuing the license and the expense of regulation, but it is also intended to be sufficiently large to prevent or discourage the keeping of such animals.''

We believe that it is a matter of common knowledge that even a small tax upon dogs quickly clears the streets of the animals which the lawmaker deems worthless, homeless, predatory or likely to be afflicted with hydrophobia. Thus, a tax upon dogs can readily accomplish police purposes. Upon the other hand, as common knowledge suggests, a tax upon dogs would yield for the public treasury an insignificant sum of money, for dogs are the subject of ownership only to a limited degree. It is thus apparent that a tax upon dogs can easily be identified as a measure emanating from the police power. In contrast to the effectiveness of a tax upon dogs, a tax in the same amount, or even in a larger sum, levied upon gamblers might have no perceptible effect in reducing their number.

The title of the 1943 act [being the measure upon which the plaintiff relies to establish his contention of preemption] follows:

"Taxing coin-operated music and other amusement devices and providing penalties."

It will be observed that the title gives no hint of a purpose to regulate or suppress.

In Cooley, Taxation, 4th ed, § 1784, it is said:

"It is often necessary to determine whether an imposition of a charge or fee by the government, generally in the shape of a license fee, is an exercise of the taxing power, i.e., a tax in the strict legal sense of the term, or is an exercise of the police power. * * *

"The distinction between a demand of money under the police power and one made under the power to tax is not so much one of form as of substance. * * * If the purpose is regulation the imposition ordinarily is an exercise of the police power, while if the purpose is revenue the imposition is an exercise of the taxing power and is a tax. If, therefore, the purpose is evident in any particular instance, there can be no difficulty in classifying the case and referring it to the proper power. * * * Only those cases where regulation is the primary purpose can be specially referred to the police power. If revenue is the primary purpose and regulation is merely incidental the imposition is a tax. * * *

"Generally, a fee or charge is an exercise of the police power rather than a tax where certain tests, conditions or qualifications are imposed in addition to the payment of money. But the mere fact that the effect of an ordinance is to declare it to be unlawful to transact the business of a broker without license does not indicate whether the purpose is to raise revenue or to regulate the business. And the fact that a license statute makes a violation of its provisions a misdemeanor does not preclude the license fee being an exercise of the taxing power rather than the police power."

*State v. Murphy,* 90 Conn 663, 98 Atl 343, says:

"Examination of the Act unmistakably discloses that it is a revenue-producing measure enacted by the General Assembly in the exercise of its taxing power, and not, as the accused claims, a regulatory measure adopted for aesthetic or other reasons in the exercise of the police power. Passing by the requirements as to the contents of applications for a license contained in the first section, hereinafter noticed, there is nothing to be found anywhere in it which is appropriate to regulation or points in that direction. No condition, except the payment of a license fee, is attached to the issuance of a license. All who pay the fee are entitled to receive one, and for whatever location it may be applied for. The amount of the fee is fixed and unvarying. The license, which thus automatically issues, entitles the licensee to an unrestricted use of the licensed space. The license is a general one authorizing the use of the space for advertising purposes generally, and without restriction as to the character of the advertisement or advertisements to be placed thereon, or the type, material or design of the structure or construction upon which they are placed, and no right of control or direction in any of these respects, or in any respect whatsoever, is reserved or provided for. No purpose could by possibility be served by the enforcement of the Act unless it be the raising of revenue. Regulation is out of the question, and prohibition, as an indirect result, could not have been thought of, so small was the license fee imposed. It is only as a revenue-producing measure that the Act is susceptible of a reasonable explanation. That purpose it does serve, *  *  *."

The following is taken from 33 Am Jur, Licenses, § 3, p. 326:

"Although license taxes usually affect property, and are sometimes made to depend upon the kind or amount of property employed, it is generally considered that a license tax is not a property tax,

and that the two are distinguishable. In the main, the distinction between a property tax and a license or privilege tax imposed for revenue is that the function of the property tax is to raise revenue by virtue of the fact that the property is within the jurisdiction of the taxing power, and no condition or restriction is imposed thereby upon the use of the property taxed, while the license or privilege tax, even though also passed to raise revenue, is imposed upon the right to exercise a privilege, and its payment is made a condition to the exercise, or continuance in the exercise, of the privilege, business, or vocation involved. Although a property tax may constitute a burden upon a business to the extent of the tax, a license or occupation tax may, if not paid, and with its ancillary provisions, bring to an end the business altogether.''

■ Previous paragraphs of this opinion took notice of the fact that when the owner of a machine pays his tax, the state can ask him no questions except those related to the collection of the tax. No official is authorized to make discriminations among those who shall be permitted to pay the tax and the places where the machines may be installed. The statute which, the plaintiff argues, preempts the regulation of these devices, displays no interest in the fitness of anyone to have a machine which, as we have seen, readily adapts itself to illegal uses. Likewise, the act imposes upon an owner no restriction as to the place where he may place his machine for operation or the number he may install. All that the state wants from owners is the amount of the tax. When owners pay the tax, the state issues to them no paper in the form of a license, but hands them a document entitled ''receipt''. Clearly, the words of the act afford no indication that the measure's purpose is to regulate, unless the amount of the annual fee makes an intimation of that kind. We are aware of no reason for inferring that the

legislature fixed the fee in the amount of $50 as a means of reducing the number of machines. The latter are employed for commercial purposes and evidently yield for their owners a profit. In that respect they are unlike dogs which are often kept for the pleasure of children. Evidently when the legislature fixed $50 as the amount of the tax, it must have had good reason for believing that the tax would yield to the state a substantial return, for § 9 of the act, as amended by Oregon Laws 1945, ch 255, says:

"After deduction of all expenses incurred in administering this act the surplus shall be allocated for the payment of old age assistance in the following manner: * * *."

The complaint shows that the surplus yielded by the act is large, for it alleges that if the validity of the ordinance is sustained, the old age assistance fund will be deprived of "material and substantial amounts of money per annum" and that the purposes of the state will be frustrated. Accordingly, we have no basis for inferring that the $50 annual exaction is sufficiently large to reduce the number of machines, but, to the contrary, have reason for believing that it has been set in an amount which is intended to yield the largest possible return. Those circumstances, of course, indicate that the enactment was made under the tax, and not under the police power of the state.

We believe that *Fox v. Galloway,* supra, deemed that the 1943 measure was enacted under the tax power of the state. We think that the following, taken from the decision, so holds:

"One of the plaintiffs' principal contentions is that the tax is not uniform and equal, and that it is therefore violative of § 32, article I, of the Oregon constitution, and violative likewise of § 1 of the fourteenth amendment to the federal con-

stitution, which guarantees to every person within the jurisdiction of the state the equal protection of its laws. In this connection, the plaintiffs assert that the statute in question is discriminatory in the following respects: '(a) in that it attempts to tax only machines vending music or amusement which have the coin-in-the-slot feature, and fails to tax machines vending the same class of merchandise without such feature; and (b) . . . in that it attempts to tax coin-in-the-slot mechanical devices which dispense music or amusement and does not tax other coin-in-the-slot devices which dispense commodities other than the two last mentioned.'

"Section 32 of Article I of the state constitution, as amended in 1917, provides that ' . . . all taxation shall be uniform on the same classification of subjects within the territorial limits of the authority levying the tax.' By this section the legislature is granted specific constitutional authority to classify subjects for the purpose of taxation, provided, that the classification is reasonable and the tax applies uniformly to all subjects within the class: Standard Lumber Co. v. Pierce, 112 Or. 314, 228 P. 812; Portland Van & Storage Co. v. Hoss, supra; Safeway Stores v. City of Portland, 149 Or. 581, 42 P. (2d) 162. A legislative classification for the purpose of taxation will not be held invalid unless it is plainly and manifestly arbitrary and without any reasonable basis: State ex rel. Veatch v. Franklin, 163 Or. 500, 98 P. (2d) 724; Quong Wing v. Kirkendall, 223 U. S. 59, 56 L. E. 350, 32 S. Ct. 192. See also State ex rel. Evans v. Kozer, 116 Or. 581, 242 P. 621, and Portland Van & Storage Co. v. Hoss, supra. This court in Standard Lumber Co. v. Pierce, supra, after stating that uniformity of taxation was required, observed:

'This does not mean that the subjects of the class selected for taxation shall be precisely alike in all respects, but rather that they must be alike in the essential particulars which induced the legislature to include them in one classification. All within the class must be susceptible of like treat-

ment and all the constituents of the class must be affected alike under like circumstances.'

"Elsewhere in that opinion it is said that the supreme court of the United States 'has declared repeatedly that the [fourteenth] amendment does not prevent the classification of subjects for taxation; that in taxation there is a broader power of classification than in some other exercises of legislation; and that the requirements of the equality clause of the fourteenth amendment are met if the state statute operates "equally and uniformly upon all persons in similar circumstances" and does not create "clear and hostile discriminations between particular persons and classes." ' "

More in like vein could be quoted from that decision, but we believe that enough has been taken to indicate that the principal authority upon which the plaintiff relies held that the source of the 1943 act was in the state's power to tax.

We are convinced that the legislative enactment which, the plaintiff argues, preempts the regulation of the devices described in the challenged ordinance is a tax measure and not one enacted under the police power of the state.

A law enacted solely in the exercise of the power to tax, manifestly, does not regulate and, therefore, it cannot preempt regulation. Likewise, a measure enacted solely as a taxation act does not legalize the possession of the object which it taxes of the exercise of the privilege upon which it lays its burden: *Enloe v. Lawson,* 146 Or 621, 31 P2d 171; *License Tax Cases,* supra; *United States v. Yuginovich,* supra; *United States v. Sullivan,* 274 US 259, 71 L ed 1037, 47 S Ct 607, 51 ALR 1020; *Mitchell v. City of Birmingham,* 222 Ala 389, 133 So 13; *Miller v. Memphis,* 181 Tenn 15, 178 SW2d 382, 511 ALR 1172. Accordingly, nothing in the 1943 act prevented the city from adopting its ordinance.

It is reasonable to infer that when the challenged ordinance is enforced, the state's revenue will be diminished. Although, when it adopted the 1943 measure, the legislature must have foreseen loss of revenue through the enactment by cities of ordinances such as the one challenged in this proceeding, it took no means to prevent such a course. The fact that the ordinance will deprive the state of revenue does not render the ordinance invalid: *Billig v. State,* 157 Md 185, 145 Atl 492; *Schlesinger v. City of Atlanta,* 161 Ga 148, 129 SE 861; *Miller v. Memphis,* supra.

■ The above, we believe, disposes of all the attacks which the plaintiff has made upon the ordinance. We have not mentioned all of the numerous authorities cited in the encyclopedic briefs filed by the parties. To have done so and to have analyzed herein all of the authorities cited in the lengthy briefs would have given this decision proportions comparable to the briefs. However, we have bestowed careful attention upon all contentions advanced by the parties and upon the many authorities which the tireless industry of their counsel found in the libraries. Obviously, the wisdom of the attacked ordinance, or its lack of it, is a matter foreign to our concern. We have expressed no views upon that subject.

It follows from the above that, in our belief, the challenged ordinance is valid. The decree of the circuit court is reversed. Costs and disbursements will not be allowed.

LATOURETTE, C. J., specially concurring.

The sole question to be determined in this case is whether or not the city of Portland has authority under the police power to prohibit ownership, use, play, etc., of coin-in-the-slot amusement devices in view of the legislative enactment known as ch 220, Oregon Laws 1943, relating to privilege taxes on such devices.

It is agreed that under the Portland City Charter the city has such a right in the exercise of its police power in the absence of state legislation preventing it. It is also agreed that if ch 220, Oregon Laws 1943, is police power legislation, then there would be a conflict between the state law and the ordinance, and the ordinance would be invalid. Counsel for plaintiff, in a colloquy between the court and him, makes the following concession:

"Q (By the Court) Do you agree that if the 1943 act is a revenue measure and not one under the police power, the city would then have the right, under the police power, to pass the ordinance in question?

"A I concede the point that if the 1943 measure, ch 220, is strictly a tax measure, then I have no standing in court."

The issue narrows down then to whether the 1943 act is a revenue raising or police power measure.

It is sometimes difficult to determine what is or is not police power legislation. Concerning this matter, a broad definition is quoted from Professor Tucker in *Stettler v. O'Hara,* 69 Or 519, 531, 139 P 743, LRA 1917C 944, as follows:

" 'Police power is the name given to that inherent sovereignty which it is the right and duty of the government or agents to exercise whenever public policy, in a broad sense, demands, for the benefit of society at large, regulations to guard its morals, safety, health, order or to insure in any respect such economic conditions as an advancing civilization of a highly complex character requires.' "

The basic distinction between revenue and police power legislation is well pointed out by Mr. Justice

BRAND in *Starker v. Scott,* 183 Or 10, 15, 190 P2d 532, wherein he said:

"If the challenged portion of O. C. L. A., § 107-243 was enacted as an exercise of the taxing power, it would be invalid for, as such, it would be violative of the constitutional requirement of uniformity. It is therefore apparent that the ultimate question for decision is whether the so-called ten per cent penalty is imposed pursuant to the police power or as a tax. While the name given by the legislature is of significance in determining whether an act is passed pursuant to the police power or to the power of taxation, it is nevertheless true, as urged by plaintiffs, that the primary purpose of a statute determines whether it is enacted pursuant to the one or the other power."

The opinion quotes with approval 1 Cooley, Taxation, 4 ed, § 27, as follows:

" 'The distinction between a demand of money under the police power and one made under the power to tax is not so much one of form as of substance. The proceedings may be the same in the two cases, although the purpose is essentially different. The one is made for regulation and the other for revenue. If for regulation, it is an exercise of the police power while if for revenue it is an exercise of the taxing power. If, therefore, the purpose is evident in any particular instance, there can be no difficulty in classifying the case and referring it to the proper power. * * *

" '* * * If revenue is the primary purpose, the imposition is a tax. Only those cases where regulation is the primary purpose can be specially referred to the police power. If the primary purpose of the legislative body in imposing the charge is to regulate, the charge is not a tax even if it produces revenue for the public. * * * *' " See also *City of Coos Bay v. Eagles Lodge,* 179 Or 83, 97, 170 P2d 389; *State v. Franklin,* 163 Or 500, 98 P2d 724; 33 Am Jur 339, Licenses, § 19 et seq.; 53 CJS 455, Licenses, § 3.

It is my opinion that ch 220, Oregon Laws 1943, is a revenue raising measure rather than one under the police power for regulation, in that the primary purpose of the act is to raise revenue for old age assistance, the act directing that 60 per cent of the moneys raised shall be credited to the public assistance fund of the state and 40 per cent to the counties. I can find nothing in the act of a regulatory nature other than that which is incidental to the main purpose of raising revenue.

Plaintiff places much stress on *Fox v. Galloway,* 174 Or 339, 148 P2d 922, wherein we said:

"Chapter 220, supra, imposes not a property tax, but a privilege tax upon the right to operate or display for operation a coin-in-the-slot mechanical device such as therein designated; and payment of the tax is made a condition to the exercise of such right: 33 Am Jur., Licenses, p. 326, § 3; 26 R.C.L., Taxation, p. 35, § 19."

And from this he deduces that plaintiff has the unlimited right to operate or display his devices.

Counsel's analysis of the *Fox v. Galloway* case is clearly erroneous. The question there was whether or not ch 220, Oregon Laws 1943, taxed the amusement devices as property (an ad valorem tax) in which connection we said to thus hold would give "rise to a serious question as to the constitutionality of the act." We there held that the tax was not a property but a privilege tax, and so it is. It is well settled that such a tax may be imposed for raising revenue. *Lyons v. City of Portland,* 115 Or 533, 536, 235 P 691; *Elsner Bros. v. Hawkins,* 113 Va 47, 73 SE 479; *Billig v. State,* 157 Md 185, 145 A 492; *Commonwealth v. Ellis,* 158 Mass 555, 33 NE 651; 51 Am Jur 46, Taxation, § 13.

In the absence of legislation on the part of the city in the exercise of its police power, owners of such devices under the Fox case would obviously have a right to operate or display them. The question of the police power of the city was not before us in that case.

It cannot be doubted that the state may preempt the field by expressly prohibiting a municipality from legislating on the matter, even though the measure were a revenue measure. However, the state, in the law under consideration, has not expressly reserved to itself such power.

The city of Portland, under its charter, has broad powers with reference to the matter in controversy: It may ignore the subject entirely; it may impose an additional privilege or occupation tax for revenue purposes; it may license and regulate, or prohibit entirely under the police power, which it did.