Argued October 29, 1962, reversed June 26, 1963

# SPROUL ET AL *v.* STATE TAX COMMISSION ET AL

383 P. 2d 754

*Thomas C. Stacer* and *Gerald F. Bartz,* Assistant Attorneys General, Salem, argued the cause for appellants. With them on the briefs were Robert Y. Thornton, Attorney General, Salem, and Clarence R. Kruger, Assistant Attorney General, Salem.

*J. R. Campbell,* John Day, and *Roy Kilpatrick,* Canyon City, argued the cause for respondents. With

them on the briefs were Yokom and Campbell, John Day.

Before McAllister, Chief Justice, and Perry, Sloan, O'Connell, Goodwin, Lusk and Denecke, Justices.

DENECKE, J.

The constitutionality of a part of the legislative design for forest fire protection in eastern Oregon is the issue in this case. The statute attacked levies an assessment of one cent per acre on those lands in eastern Oregon which the legislature found present a special fire hazard. The fund raised by this levy is used for the payment of fire protection and suppression costs.

The trial court decided that the one-cent-per-acre levy was an exercise of the state's taxing power. It held that it was a property tax and it was invalid because it was not assessed upon an ad valorem basis.

The statute states that the one-cent-per-acre levy is "a tax upon the owners of Class C forest lands for the privilege of using such lands." ORS 477.930. The label the legislature places on a levy is an important factor to be considered in determining into what category to place the levy. However, such a label is not conclusive of the nature of the levy. *Terry v. City of Portland*, 204 Or 478, 499, 269 P2d 544, appeal dismissed 348 US 979, 75 S Ct 571, 99 L ed 762.

We hold that the levy is not an exercise of the state's taxing power. We conclude that such levy is an exercise of the state's police power.

The Oregon constitutional provision requiring uniformity of taxation does not restrict the state in its exercise of the police power, as distinguished from the

taxing power. *Starker v. Scott,* 183 Or 10, 15, 190 P2d 532. This proposition is universally accepted and is grounded on the reasoning that the primary purpose of the money exaction is not to raise revenue, but to directly promote the public welfare. 4 Cooley, Taxation (4th ed), § 1784.

In order to arrive at this conclusion the fire protection and suppression program evolved by the Oregon Legislature must be examined in detail. This is not an easy task. Forest fire protection laws originated in Oregon in 1913. Oregon Laws 1913, ch 247, p 483. They have grown like Topsy and apparently have never been revised.

Since 1913 the state has directed every landowner with timber to protect his land against the start and spread of fire. Oregon Laws 1913, ch 247, p 483. (This is apart from the landowner's liability for the tortious start or spread of fire.) Fire protection includes fire suppression. Fire protection in Oregon is carried out by: (1) the landowner, individually, or in association with other owners, (2) the state of Oregon, and (3) the United States government, the largest timber owner in Oregon. These three are authorized to enter into cooperative agreements with each other to provide and maintain a coordinated fire protection and suppression system. ORS 477.028, 477.073; Act of June 7, 1924, ch 348, 43 Stat 653, 16 USCA §§ 564, 565 (1960 ed).

The individual timber owner is deemed to have complied with the statute requiring him to protect his land against the start or spread of fire if he files with the State Forester an adequate protection plan and has the facilities to carry it out; or if he belongs to an association having such a plan and facilities. If the individual owner does neither, the state provides the

fire protection. ORS 477.024. The state does this with its own personnel and funds or through private associations or the federal government by agreements with such groups.

In 1953 the legislature substantially changed the method of paying fire protection costs. Oregon Laws 1953, ch 372, p 641. For the previous 40 years the landowner had been directed to provide fire protection; if he did not, the state did and charged the expense to the landowner. §§ 107-241, 107-243, OCLA. In 1953 it was provided that the forest lands of the state would be divided into districts, termed, "official fire districts," or "fire protection districts." ORS 477.001, 477.004, 321.005(6); Oregon Laws 1953, ch 372, § 2(3). Each district prepares an annual fire protection budget. The funds necessary to finance this budget are raised by prorating the proposed expenditures upon the acreage within the fire protection district.[1] ORS 477.030. The statute provides that the prorated cost for grazing land shall not exceed five cents per acre per annum unless the actual cost for protection and suppression of the grazing land exceeds this amount. The pro rata cost on timber land in the district has no limitation. These per-acre assessments to finance the budget become liens on the property assessed and the amount thereof is collected by the county along with the collection of the ad valorem taxes. ORS 477.033. If the Forester's costs for the fire protection and suppression exceed the amount

---

[1] Moneys for this fund also may come from the "Forest Emergency Fire Cost Fund," which by ORS 321.175 was continued. It is not at all certain, but it appears that there were moneys in this fund when the statute was amended in 1953 by ch 375, § 20, and whatever remained in the fund at that time could be used for equalizing fire protection costs.

budgeted, the excess is added to the next year's budget of the fire protection district. ORS 477.035.

Members of a responsible private fire protection agency are not required to contribute to meet the fire protection budget of the district wherein their land lies. ORS 477.024(2), 477.037. Federal lands are not assessed unless, under a cooperative agreement between the state and the federal government, the federal land is under the fire protection of the state rather than the federal government and the agreement provides for the assessment. ORS 477.053.

Any landowner who is affected by this legislation has a right to a hearing before the State Forester "on any subject pertaining to the activities of the forester or board affecting the land," including the cost charged for fire protection. ORS 477.039.

This legislation is not that which is under attack in this case. However, an understanding of the operation of such legislation is necessary to understand the operation of the legislation that is under attack.

The statute which the plaintiff claims is contrary to the Oregon Constitution was enacted in 1959. Oregon Laws 1959, ch 320, p 468. The known legislative history of this act is ambiguous. However, with this history, added to the words of the statute itself, the purpose of the legislation can be determined with some certainty. In the interval between 1953 and 1959 certain areas of eastern Oregon had incurred very substantial fire fighting expenses; other areas had very little expense. The 1959 legislation was an attempt to partially spread the future costs of fire protection and suppression throughout all of the fire protection districts of eastern Oregon. Before the 1959 legislation, all the fire protection and suppression costs in one eastern Oregon district had to be wholly

borne by that district. ORS 477.950(2), a part of the 1959 legislation, states: "The insurance principle is recognized in providing funds for emergency forest fire control on Class C * * * forest lands." Class C forest lands are eastern Oregon lands with a special fire hazard. A more precise definition will be set forth later.

To spread this risk the statute levied an annual per-acre assessment on all Class C forest lands in the amount of one cent per ace. ORS 477.930. The moneys were to be collected in the same manner as the amounts collected to meet the fire protection budgets of the various districts. The moneys so collected are deposited in the "East Side Emergency Fire Cost Fund" account. ORS 477.970.

ORS 477.970(3) provides:

"* * * the moneys credited to the East Side Emergency Fire Cost Fund hereby are appropriated continuously for and shall be used by the forester, under the supervision and direction of the board, for the purpose of equalizing emergency fire suppression costs in fire protection districts containing Class C forest lands in order to safeguard the interests of the owners of such lands."

The size of the fund is never to exceed $250,000.[2] When and if the fund reaches $250,000, the levy of one cent per acre is discontinued for the next year. ORS 477.950.

In the 1953 revision of the fire protection system,

---

[2] Oregon Administrative Rules, ch 629, § 41-030, provides:

"In order that the principle of deductible insurance prevail when moneys from the East Side Emergency Fire Cost Fund are made available, the fire protection district shall first expend an amout equal to ½¢ per acre for Class C forest lands within the district; thereafter, said district may file a claim for emergency fire suppression costs."

procedures for equalizing fire suppression costs in western Oregon were adopted. Oregon Laws 1953, ch 375; ORS 321.015, 321.165. A "forest harvest tax" was levied upon all forest products harvested in western Oregon. The rate was set at four cents per thousand feet. The proceeds of this levy were deposited in the Forest Emergency Fire Cost Account. This account was to be used to equalize fire suppression costs in western Oregon. ORS 477.135. If the account reached $750,000, the levy was suspended. ORS 321.035.

Previous statutes providing for the raising of funds for fire protection have been upheld by this court. The first case so holding was *First State Bank of Sutherlin v. Kendall Lumber Company*, 107 Or 1, 213 P 142 (1923). It was contended in that case that the original fire protection act of 1913 was unconstitutional. That Act, supra, provided that if the landowner did not provide fire protection, the state would provide it at a cost not to exceed five cents per acre. The landowner contended that the legislation providing for the per-acre assessment was contrary to the Oregon Constitution in that it failed to provide for "a uniform and equal rate of taxation" and deprived the landowner of his property without due process of law. (The landowner did not specify whether it was the federal or state Due Process Clause which it claimed was violated.)

"* * * This statute was not designed for the purpose of raising revenue, and its enactment was not an exercise of the taxing power of the state. The act is a reasonable and proper police regulation designed to protect the forests of the state from destruction by fire. The method adopted by the legislature to compel the delinquent owner to reimburse the state for the moneys so expended provides merely for the collection of an indebted-

ness imposed under the police power of the state, and not for the collection of a tax." (107 Or, supra, at 13)

A 1935 amendment to the original 1913 act was passed upon in *Starker v. Scott,* supra (183 Or 10). The 1935 amendment provided that in addition to the actual cost of fire protection the landowner was also required to pay a 10 per cent penalty if he failed to provide his own protection; this penalty was also to be a lien upon his land. Oregon Laws 1935, ch 356, p 564. The sums collected as a penalty were also to be expended for fire protection. The landowner contended that the penalty "constitutes an exercise of the power of taxation and as such is unconstitutional because it is not levied according to the rule of uniformity." (at 14) The court stated the issue in this manner:

"If the challenged portion of O. C. L. A., § 107-243 was enacted as an exercise of the taxing power, it would be invalid for, as such, it would be violative of the constitutional requirement of uniformity. It is therefore apparent that the ultimate question for decision is whether the so-called ten per cent penalty is imposed pursuant to the police power or as a tax. * * *" (at 15)

The court interpreted the statute to require that the proceeds from the penalty were to be used to reimburse the Forester for general costs such as investigating the need for fire protection, cost of collecting the assessments, etc.

The court, quoting from 1 Cooley, Taxation, § 27, made a statement of the accepted principle that an exaction of money for general revenue purposes is an exercise of the power of taxation, while an exaction of

money for regulation is an exercise of the police power. *Starker v. Scott,* supra (183 Or at 15-16).

The court held:

"The statute relating to forest patrol assessments and penalties clearly indicates its character as a regulatory measure under the police power. It first imposes a duty upon the timber owner and then provides that in the event that the owner shall fail or neglect to perform that duty, the necessary work will be done by the state and the cost, plus a penalty will be collected from the owner." (at 19)

■ The purpose of the statute here is concerned with fire protection and suppression; therefore, in that respect it is an exercise of police power. The one-cent-per-acre levy is not for the purpose of raising general revenue, but solely for fire protection and suppression; therefore, in that respect the statute is an exercise of the police power.

There is a difference, however, in the operation of the earlier fire protection and suppression statutes and the one here under consideration. The earlier statutes were written in terms of "regulation." These earlier laws directed the landowner to provide fire protection; if he did not, the state provided the protection and charged the cost thereof to the landowner. The basic fire protection laws now in effect do likewise. They command the landowner to adequately protect against fire. If the landowner does, he does not have to pay the assessment to raise the fire protection budget of his district. Only if the landowner does not provide adequate protection is he liable for the assessment to meet the fire protection budget of his district. Perhaps the one-cent-per-acre levy could be sustained as being a minor and incidental part of

this overall plan of fire protection and suppression couched in the terms of "regulation." However, it is believed preferable to meet the problem more directly.

The statute authorizing the one-cent-per-acre levy does not "regulate"; it does not direct the individual to do anything. It simply levies an assessment upon every Class C forest landowner. The purpose of the statute is to collect money to partially reduce the amount certain landowners will have to pay for fire protection and suppression.

Does the fact that this part of the fire protection and suppression program does not "regulate" mean that it is not an exercise of police power, but rather an exercise of the taxing power? We do not believe so.

The statute is interpreted to be legally similar to a hypothetical statute in which the state directly performs all the fire protection and suppression and assesses the cost thereof to all forest landowners, prorating the assessment on an acreage basis; under the hypothetical statute, no direction or "regulation" is imposed on the landowner. Attempting to put this in sharper focus, the present statute is regarded as legally similar to a hypothetical city ordinance which finds that a certain geographical area of the city requires more police protection than other areas and the cost of this additional police protection is charged to this particular geographical area and assessed on a pro rata per-unit-of-area basis.

The question is,—when the government acts to promote the public welfare by direct action rather than by regulation, is such direct action an exercise of police power and can the cost of such action be exacted from the particular persons or property who necessitate the government action and on a basis other than the value of the property involved?

Police power is usually exercised by regulation. Persons are commanded to do something or prohibited from doing something. However, there are numerous examples of states exercising police power by methods other than regulation. Professor Freund in 1904, in his important treatise on the police power, wrote:

"The protection of persons and property from the elements, from mechanical forces pressed into human service, and from disease, calls in many respects for the combined action of society, and the urgent need of this protection makes it impossible to wait for, or to rely entirely upon, voluntary combination. A large amount of state activity is thus called into play. The government provides for the preservation of life, health and property by preventive and other arrangements, which it manages in a proprietary capacity and places at the service of the public; but in addition it regulates, compels and restrains private action for the like purpose. * * *" Freund, Police Power, 109.[9]

Recently, this court upheld the action of a subdivision of the state exercising its police power in a nonregulatory manner. *Baer v. City of Bend,* 206 Or 221, 292 P2d 134. In that case the court upheld the right of the city to introduce fluoride into the city water supply. The court stated: "The legislation in question was adopted by the city in the exercise of its police power * * *." (at 224) The municipality did not require any person to do anything or prohibit them from doing anything.

*Rogers v. City of Salem,* 61 Or 321, 332, 122 P 308,

---

[9] In his treatise he believed it necessary for the purpose of clarification to restrict the definition of "police power" to regulation. (at 18)

was a suit to enjoin the collection of an assessment for a sewer. The court said:

"In adopting these plans or maps and specifications, and prescribing the limits of the area to be drained by the sewer, no notice thereof to the taxpayers was necessary. [Citation] The construction of a sewer by a city is the exercise of the police power for the health and cleanliness of the municipality, and such power is exercised solely at the legislative will. * * *"

The above statement was made partially upon the authority of *Paulsen v. City of Portland*, 16 Or 450, 19 P 450, affm'd 149 US 30, 13 S Ct 750, 37 L ed 637.

Mr. Justice Brewer, speaking for the court, stated in that case:

"* * * By Ordinance 5068 it [city] ordered the construction of a sewer, and directed what area should be drained into that sewer, and created a taxing district out of that area. For these no notice or assent by the taxpayer was necessary. A sewer is constructed in the exercise of the police power for the health and cleanliness of the city, and the police power is exercised solely at the legislative will. * * *" (13 S Ct at 753)

In the construction of a sewer the only command the government makes to its citizens is to pay for the sewer.

In 4 Cooley, Taxation (4th ed), the building of sidewalks, sewers, levies and drainage facilities are all classified as an exercise by the state, or one of its subdivisions, of the police power. Assessments made against the property owners for the payment of the cost of these improvements are deemed to be a part of the exercise of the police power and not of the power of taxation. §§ 1788-1791.

The inference from some of the above-quoted authorities is that there is a close link between moneys exacted to pay for the state's exercising its police power and moneys exacted by what are commonly called "special assessments" to pay for public improvements. There is such a link.

> "The judicial view is sometimes expressed that the levying of special assessments for certain improvements is an exercise of the police power, as distinguished from an exercise or delegation of the power of taxation." 14 McQuillin, Municipal Corporations (3d ed), 18, § 38.01.

*Rogers v. City of Salem,* supra (61 Or 321), supports this proposition.

Special assessments usually involve assessments for sewers, streets and other public improvements. Such assessments are not limited by the constitutional limitations on the taxing power. *St. Benedict's Abbey v. Marion County,* 50 Or 411, 93 P 231, appeal dismissed 218 US 688, 31 S Ct 219, 54 L ed 1210.

This discussion does not necessarily lead to the conclusion that the cent-per-acre assessment in this case should be classified as a "special assessment." The law of "special assessments," however, is analogous. It is analogous by illustrating that when certain property necessitates or makes it desirable for the state to exercise its police power, that property can be required to pay for the cost of that exercise of the police power and the constitutional limitations upon the power of taxation are not applicable. If all the people of the state, or all the property in it, are required to pay the costs of the state's exercise of the police power, the constitutional limitations on taxation must be satisfied. When the cost is to be paid only by

the persons or property causing the exercise of the police power, such limitations are irrelevant.

■ If the state is required to exercise its police power because certain properties present a special threat to the safety of the state, those lands can be charged for the costs of this exercise of the police power. These lands present a special threat to the state's resources. By statutory definition, "forest lands" are those containing "enough inflammable forest growth or debris to constitute a fire hazard." ORS 526.005(4). The legislature has singled out the owners of such lands and directed them to provide adequate fire protection. ORS 477.024. The legislature has also required that the owners of such lands pay for the fire protection provided by the state for these same lands.

This court has not heretofore held that the state can require the property owners who have caused the state to exercise its police power to pay for the exercise of such police power except in "special assessment" cases. Other jurisdictions, however, have so held.

*Foster's, Inc. v. Boise City,* 63 Idaho 201, 118 P2d 721, upheld a municipality's right to install parking meters. This court has also so held. *Hickey v. Riley,* 177 Or 321, 162 P2d 371. The Idaho court said:

"Effective exercise of the police power necessarily involves expenditures in many ways. The means and instrumentalities, by and through which the supervising powers of the policing authority are brought to bear on the subject to be regulated, involve costs and expenses. *It is only reasonable and fair to require the business, traffic, act, or thing that necessitates policing, to pay this expense.* To do so has uniformly been upheld by the courts. * * *" (Emphasis added.) (at 728)

A South Carolina law recited: " 'Whereas the lands of Sullivan's Island have been set apart for such

citizens of this state as may resort thereto for the purposes of health, and to this end have been placed under the regulation of the town council of Moultrieville; and whereas, in order to secure the purposes for which the said lands have been so set apart, it is essential that the said town council should be empowered to secure such means as may be necessary to carry out the ends proposed: (1) * * * That the town council of Moultrieville be, and they are hereby authorized by ordinance, to assess each lot owner on said island for each and every lot possessed by him or her such sum or sums of money, not exceeding ten dollars for each lot, as the said town council may deem necessary, for the purposes of keeping in proper order the streets, ways, beaches, and commons of the island and the health of the same.'" *Thomas v. Town Council,* infra, at 648.

In *Thomas v. Town Council,* 52 SC 181, 29 SE 647, the court upheld an $8 per acre assessment under the above statute. The landowner relied upon the state constitutional provision that: " 'All property subject to taxation shall be taxed in proportion to its value.'" (at 648) The court said:

"It seems to us that the intention of the legislature * * * very clearly was to provide a means for the better preservation of its people. * * * When the town council of Moultrieville required each owner of a lot to pay the sum of eight dollars to keep up the streets, ways, beach, commons, etc., it was strictly within its chartered rights. This in no wise contravenes the constitutions of 1868 or 1895. It is not a tax upon property. It seems to us to belong to the exercise of the police power, and as this police power is viewed in McCandless v. Railroad Co., 38 S. C. 103, 16 S. E. 429, it is clearly

within the same, relating, as it does, to the public health. * * *" (at 648)

There was an Oklahoma law which provided for an assessment of one per cent of a bank's deposits. The proceeds of this assessment were used to create a depositors' guaranty fund. The validity of this statute was upheld in *Noble State Bank v. Haskell,* 219 US 104, 31 S Ct 186, 55 L ed 112. Mr. Justice Holmes, speaking for the court, stated:

"* * * it would seem that there may be other cases beside the everyday one of taxation, in which the share of each party in the benefit of a scheme of mutual protection is sufficient compensation for the correlative burden that it is compelled to assume. [Citation] At least, if we have a case within the reasonable exercise of the police power as above explained, no more need be said." (31 S Ct at 188)

A Tennessee law required a public utility to pay fees, proportioned upon its gross receipts, into a fund to be used "for the inspection, control, and supervision of the business, service, and rates" of public utilities. The utility contended that this exaction of fees was a tax. In *Memphis Natural Gas Co. v. McCanless,* 183 Tenn 635, 194 SW2d 476, the court held to the contrary, stating:

"* * * Such a levy is a special assessment for a specific purpose and lacks essential elements of a tax * * *

"* * * * *

"Even if the purpose of the assessment was limited to the exercise of the police power, fees imposed to defray the expenses of that exercise are not objectionable. * * *." (at 483)

These last two cases should be considered with the knowledge that they involve businesses which can

be and are licensed. The legislature can, as a condition to their licensing, require that they pay the costs of the state's exercising its police power. That basis, however, was not the basis stated by the court in upholding the assessments; rather, the court upheld the assessments on the basis that when persons necessitate the exercise of police power, the cost of exercising such power can be assessed to the persons necessitating its exercise.

■ Persons or property necessitating the state's exercising its police power cannot be made to pay for the cost of such exercise on an unfair or discriminatory basis. Assessments or other exactions to pay for the exercise of police power are subject to constitutional limitation just as is the exercise of police power by regulation.

Freund, supra, at 635, stated the limitations as follows:

"It is an elementary principle of equal justice, that where the public welfare requires something to be given or done, the burden be imposed or distributed upon some rational basis, and that no individual be singled out to make a sacrifice for the community. This principle lies at the foundation of the law of taxation, and applies equally to the police power. With reference to the latter it may be expressed by saying *that to justify the imposition of a burden there must be some connection of causation or responsibility between the person selected or the right impaired and the danger to the public welfare or the public burden which is sought to be avoided or relieved. * * *"* (Emphasis added.)

This court has expressed the constitutional restriction as requiring that there must be a "substantial

relation to the legitimate objects sought to be gained, i.e., the furtherance of the public health, morals, safety or welfare." *Shaffner v. City of Salem,* 201 Or 45, 51, 268 P2d 599, and cases collected therein.

When police power is exercised by the construction of a public improvement, such as a sewer, this "connection of causation or responsibility between the person selected * * * and the danger to the public welfare or the public burden which is sought to be avoided or relieved" is the concept of "benefit." (Freund, supra, at 635) *In re East Third Street Franklin (Boyle v. City of Bend),* 234 Or 91, 380 P2d 625. In the example of a sewer, to be benefited by an improvement, means that the property owner can make use of the sewer. *Duniway v. Cellars-Murton Co.,* 92 Or 113, 170 P 298, 179 P 561.

The analogy of "special assessments" is of assistance in determining how close must be the connection between the burden and the object of the police power.

■ The line of causation between benefit and public improvement need not be too close and distinct. " '* * * to justify an assessment of benefits to particular lands it is not essential that the benefits be direct or immediate.' * * *." *Northern Pacific Terminal Co. v. City of Portland,* 80 F2d 738, 742 (9th Cir 1935).

The ratio between the percentage of benefit conferred and the percentage of cost paid need not be computed precisely.

"* * * the assessment will be upheld whenever it is not patent and obvious from the nature and location of the property involved, the district prescribed, the condition and character of the im-

provement, the cost and relative value of the property to the assessment, that the plan or method adopted has resulted in imposing a burden in substantial excess of the benefits, or disproportionate within the district as between owners. * * *" *Austin v. Tillamook City,* 121 Or 385, 395, 254 P 819.

The connection between the one-cent levy and the exercise of the police power is clear. The property assessed presents a special fire hazard and the levy is to create a fund to partially reimburse those who are required to pay emergency fire fighting costs. It is impossible to determine in advance which Class C forest landowners or fire protection districts will be required to pay emergency costs to suppress fires. The fire fighting costs attributable to land bearing sagebrush and jack pine might be many times greater than those attributable to land containing valuable stands of merchantable timber.[4] The fire fighting costs in the Northeast Oregon Fire Protection District might be excessive one year and the next this might be true in the Klamath Fire District.

■ The plaintiff property owners in Grant county may be, or may never be, recipients of the fund built up by the one-cent levy. Because of the creation of the fund, however, they are granted the same advantage that immediately accrues to one who has purchased insurance. If the fire fighting costs which plaintiffs, directly or indirectly, are called upon to bear are excessive, this fund is available to equalize their costs.[5]

---

[4] The basic assessment to meet the fire protection district budget limits the levy on Class 3 land to five cents per acre or actual cost for such acreage. There is no limitation on Class 1 and 2 land.

[5] The plaintiff landowners do not agree with the statement that all Class C forest landowners can share in the fund created by the one-cent-per-acre levy. They contend that only those

Only those property owners who are required to pay the one-cent levy are eligible to have their fire suppression burden equalized by this fund.

There is a rational connection between the burden imposed, the one-cent levy, and "the danger to the

landowners who are furnished protection directly by the State Forester and are assessed to pay the annual fire protection district budget can be assisted by the fund. They assert that the landowner who provides fire protection by private association or individually, or who is provided fire protection by the federal government, gets no assistance from this fund. The statutory jungle of Oregon Forest Laws does not show clearly that they are wrong in this contention, but after a treacherous trek through this legal morass and the construction of all ambiguity in favor of constitutionality, we have come to the conclusion that all Class C forest landowners can directly or indirectly share in the benefits of this fund.

ORS 477.970(3) provides that this East Side Emergency Fire Cost Fund shall be used "for the purpose of equalizing emergency fire suppression costs in fire protection districts containing Class C forest lands." The key is,—what are fire protection districts? Without referring to the numerous ambiguities and the sometimes conflicting statutes, we reached our conclusion primarily because of an official order of the Oregon State Board of Forestry, dated May 18, 1955, with map incorporated, which seems to put all forest lands into fire districts, and because of the provisions of ORS 477.004 and Oregon Administrative Rules of the Board of Forestry, § 41-080. This regulation provides for payment from the fund to a private contractor providing fire protection in a fire protection district.

ORS 477.028–477.030 are interpreted to require that property directly protected by an agency of the United States, pursuant to an agreement between such agency and the State Forester, pay their proportionate share of the fire protection district's budget, as provided in ORS 477.030. No law excluding such property owners from that assessment has been found. Being required to pay their share of this budget, such property owners are eligible to share in the equalizing accomplished by a distribution to their district budget from the outside Emergency Fire Cost Fund.

It is reasonable to assume that the anticipated cost to the United States of protecting these private lands and the assessments from such lands paid to the State Forester are taken into consideration in negotiating agreements between the United States and the State Forester as to which party is protecting what land and what charges are to be paid by one to the other.

public welfare or the public burden which is sought to be avoided or relieved." (Freund, supra, at 635). The method the legislature has selected to impose this burden is not patently disproportionate among the property owners assessed.

██ If the state in the exercise of its police power imposes the burden of its exercise on some persons or property and withholds it from others such exercise of the police power is subject to further constitutional limitation. "* *. * the classification must be based upon a real and substantial difference between the classes. Moreover, the difference between the classes must be relevant to the purpose which the act undertakes to achieve." *Namba et al v. McCourt and Neuner,* 185 Or 579, 612, 204 P2d 569. The one-cent-per-acre levy is only upon eastern Oregon lands. As previously stated, fire suppression costs in western Oregon are equalized from a fund financed by a forest products harvest tax on western Oregon timber. The legislature made a statement of policy that because of a difference in tree species and in logging practices between eastern and western Oregon, different fire protection problems exist in the two areas and, therefore, different legislation is necessary to meet these problems. ORS 321.011.⑥ The legislature's declaration that there

---

⑥"* * * The Legislative Assembly recognizes that the forested areas situated within eastern Oregon predominate in Ponderosa pine trees and associated species, and that the forested areas situated within western Oregon predominate in Douglas fir and associated species; that because of this difference in species, different forest fire protection problems exist in eastern and western Oregon, and different logging conditions and circumstances in each necessitate varied forest practices in the disposal of forest slashings and debris; and that, therefore, in order to give recognition to such differences and their effect on the accomplishment of the public policy stated in this section, certain classifications of forest lands within the State of Oregon are established by ORS 321.005 to 321.255."

is a real difference in the fire protection problems of the two areas is certainly not clearly unreasonable and, therefore, the classification is not invalid. *Kroner v. City of Portland et al,* 116 Or 141, 240 P 536.

In their brief plaintiffs argue that it is impossible to determine from the statute what lands are subject to the levy. At oral argument plaintiffs were understood to contend that land containing nothing but sagebrush could be subject to this levy. As we understand these arguments, they are in effect a charge of arbitrary classification.

This levy is imposed upon all Class C forest lands. "Forest land" is defined as "any forested land, woodland, brushland, cutover land or clearing, which, during any time of the year, contains enough inflammable forest growth or debris to constitute a fire hazard." ORS 477.001(6).

Class C forest lands are all forest lands in eastern Oregon. ORS 477.910(2). The statute could have stated the one-cent levy was upon all forest land, as that term is defined in the statute, in eastern Oregon.

The statute defining Class C forest lands further states that such lands are "lands * * * classified under the provisions of ORS 526.330 or 526.340." This classification procedure originated in Oregon Laws 1937, ch 381. It provides that county classification committee shall classify all forest lands in the county into three classes: Class 1, land primarily suited for timber production; Class 2, primarily suited for joint timber production and grazing; and Class 3, primarily suited for agricultural use. The procedure provides for notice of hearing and appeal for the landowner. ORS 526.330. The classification was for the purpose of enabling the forester to administer the forest and

fire laws "as best to promote the primary use for which that land is classified." ORS 526.350.

■ The legislature made a declaration of policy that Class C forest land "involves conditions and activities making such lands more susceptible to fire; * * *." This declaration was not unreasonable.

We construe the statutes to impose the levy only upon those lands defined as "forest land," i.e., brushland, cutover land, etc., "contain[ing] enough inflammable forest growth or debris to constitute a fire hazard." ORS 477.001(6). Under this interpretation the singling-out of Class C forest lands to bear the one-cent levy is not an unreasonable classification.

In summation, the state can act to promote the public health, welfare and safety by regulation, i.e., directing the conduct of its citizens and others. It can also promote public welfare by acting directly rather than by directing its citizens to act. When the state itself acts directly to promote public welfare it can charge the cost of its action to all the people and property of the state. If this course is followed, the cost is collected by the state in its exercise of the power of taxation and the constitutional limitations upon the exercise of this power must be observed. The crux of this opinion is that the state has the alternative of assessing the costs of the exercise of its police power upon those persons or properties necessitating or causing the state to exercise its power and that the collection of its costs by this method is not subject to the constitutional limitations applying to the exercise of the power of taxation. There appears to be no valid reason for interpreting either the Oregon or the federal constitution to prevent the legislature from using either alternative in raising the funds necessary

for the state to exercise its police power for the public welfare.

The judgment is reversed.

SLOAN, J., specially concurring.

I concur in the result of the majority and have no vigorous quarrel with the means of reaching that result. This case was heard in Pendleton in October of 1962. In the meantime the parties were asked for additional briefs in answer to specific questions asked by this court. It is apparent, therefore, that decision in this case has been difficult to reach. Justice Denecke has performed a yeoman's service by his extensive work which has provided an answer to the case satisfactory to the majority.

The obstacle course that has delayed decision has been the effort to test the tax by a particular label. That is: Is the tax a property tax, a police power tax, a privilege tax or what? This attempt to identify the tax by a label can be attributed to the influence of Cooley on Taxation; the last edition of which was published in 1924 and the earlier work by Cooley himself is almost a century old. It appears to me that this kind of testing is no longer feasible. The ever more diligent search by local and state governments to find new forms of taxation, will shortly, if not now, compel this court to examine the legislative power as limited by the Federal and State Constitutions, particularly the latter. It is my view that we should now meet the problem head on and not lend further complexity to the ultimate decision by straining the limits of the police power. In this instance, the sole purpose of the tax was to raise revenue. The regulatory features of the Forestry Code are distinct and separate and bear little relationship to the taxing

acts. The tax should be treated as a means of raising revenue.

This opinion may be of assistance to no one. It is hoped, however, that as these problems multiply some of the discussion that follows may provide some guideposts.

First concern should be given to the declaration of legislative policy found in the questioned statutes. This policy is particularly important for classification of the lands and of the methods of taxation in respect to forest lands.

This declaration of policy and the basis for classification are found in ORS 477.005:

"(1) The preservation of the forests and the conservation of the forest resources through the prevention and suppression of forest fires hereby are declared to be the public policy of the State of Oregon.

"(2) In order to accomplish the purposes of the policy stated in this section:

"(a) The need for a complete and coordinated fire protection system is acknowledged; and

"(b) This chapter shall include all persons and activities designated in this chapter, irrespective as to whether or not such person or activity is concerned with the harvesting, cutting, removal or marketing of trees, timber or other forest products."

and ORS 321.011:

"The prevention and suppression of forest fires on forest lands for the preservation of forest resources and the continuous growth of timber on lands suitable therefor are declared to be the public policy of the State of Oregon. The Legislative Assembly recognizes that the forested areas situ-

ated within eastern Oregon predominate in Ponderosa pine trees and associated species, and that the forested areas situated within western Oregon predominate in Douglas fir and associated species; that because of this difference in species, different forest fire protection problems exist in eastern and western Oregon, and different logging conditions and circumstances in each necessitate varied forest practices in the disposal of forest slashings and debris; and that, therefore, in order to give recognition to such differences and their effect on the accomplishment of the public policy stated in this section, certain classifications of forest lands within the State of Oregon are established by ORS 321.005 to 321.255."

Other sections directly relating to the taxing sections of the Act are referred to in the majority opinion. As the majority opinion emphasizes, these sections of the Code are confusing. However, it seems clear that the whole of the Act gives an intrinsic statutory meaning to the words "forest lands," a meaning unrelated to any other literal connotation of the words. This becomes important when the legislative power to set apart and specially tax such lands is considered.

Next in order are the Oregon constitutional limitations on the legislative taxing power. In 1917 the people of Oregon amended the constitutional limitations. These amendments substantially increased that power. The pertinent sections before and after amendment read:

"No tax or duty shall be imposed without the consent of the people or their representatives in the legislative assembly; and all taxation shall be equal and uniform." Article 1, § 32.

That section was amended in 1917 so as to read:

"No tax or duty shall be imposed without the consent of the people or their representatives in

the Legislative Assembly; and all taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax."

Article 9, § 1 before the 1917 amendment read:

"The legislative assembly shall provide by law for uniform and equal rate of assessment and taxation; and shall prescribe such regulations as shall secure a just valuation for taxation of all property, both real and personal, * * *."

After the 1917 amendment the section now provides:

"The Legislative Assembly shall, and the people through the initiative may, provide by law uniform rules of assessment and taxation. All taxes shall be levied and collected under general laws operating uniformily throughout the State."

The permissive limits of taxation wrought by these amendments were comprehensively analyzed in *Standard Lbr. Co. v. Pierce et al,* 1924, 112 Or 314, 228 P 812. The full significance of the opinion can only be gained by reference to it. Extracts from the opinion are pertinent. These statements were made as to the purpose and intent of the amendments, at pages 333 and 335:

"The state Constitution as originally adopted and until changed by the amendments above set out required that all taxation should be uniform and equal and enjoined upon the legislative assembly, the duty to provide for a uniform equal rate of assessment and taxation. To that end the legislative assembly was commanded to 'prescribe such regulations as shall secure a just valuation for taxation of all property, both real and personal.' These constitutional mandates confined the legislative assembly in the taxation of property, to the adoption of a proportional tax; the percentage or

rate of levy of the tax was required to be absolutely equal upon all property of whatever kind, and applied to all such property upon a relatively equal assessed valuation thereof, and while the power of the legislature to divide property selected for taxation, into classes was not restrained by these limitations, when property was once selected, that property was required to be valued and taxed at equal rates—that is, at the rates of assessment and taxation applicable to all other property: * * *."

* * * * *

"Notwithstanding, the state Constitution in its original form did not prevent the imposition of taxes of the character last mentioned, the conviction became general, that the limitations of the Constitution which confined the legislature in the taxation of property to a proportional tax thereon were no longer adapted to the needs of the state. Demand was made for removal of those constitutional restrictions, which prevented the classification of property in respect to its nature, condition or class, and the imposition thereon of different rates of taxation upon different classes of property; and which excluded considerations of faculty or ability to pay, equality of sacrifice or governmental advantages provided to the taxpayer; See Voters' Pamphlet, Special Election, June 4, 1917, p. 14; Cooley on Taxation (4 ed.) * * *."

The *Standard Lbr. Co.* case has other significance. It held that the Oregon Constitutional restrictions in respect to equality and uniformity, after the 1917 amendments, were the same as those imposed on the states by the equal protection clause of § 1 of the 14th Amendment to the Federal Constitution. 112 Or at 333; see also *In Re Estate of Heck*, 1926, 120 Or 80, 86, 250 P 735, 736. The importance of that determination can be realized when we examine the decisions of the Supreme Court of the United States in respect

to the 14th Amendment as those decisions relate to problems presented by this case.

From that examination we learn that the limitations of the 14th Amendment upon the states' power to classify and then to tax, prevents only that which is manifestly arbitrary and capricious. In decisions particularly pertinent to this case, the court has held that the "* * * XIVth Amendment was not intended to compel the states to adopt an iron rule of equal taxation." *Bell's Gap Railroad Company v. Pennsylvania*, 1890, 134 US 232, 237, 10 S Ct 533, 535, 33 L Ed 892, 895.

> "In its exercise [of governmental power] in taxation, we have said, it is competent for a State to exempt certain kinds of property and tax others, the restraints upon it only being against 'clear and hostile discriminations against particular persons and classes.' Discriminations merely are not inhibited, for, it was recognized, that there are 'discriminations which the best interest of society require.'" * * *

> * * * "In other cases it is said that facts which can be reasonably conceived of as having existed when the law was enacted will be assumed to justify it." *Heisler v. Thomas Colliery Co.*, 1922, 260 US 245, 255, 256, 43 S Ct 83, 84, 67 L Ed 237, 241.

In *Allied Stores of Ohio v. Bowers*, 1959, 358 US 522, 79 S Ct 437, 3 L Ed2d 480, many of the earlier decisions are cited and the powers of the state legislatures reiterated and emphasized. From that particular decision we learn that the State "* * * is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value." 358 US at 527. The *Allied Stores* opinion gives equal importance to the validity of a tax imposed

in furtherance of a legitimate state policy if any "state of fact reasonably can be conceived that would sustain it." 358 US at 528.

However helpful these, and other, decisions of the Supreme Court may be in support of the broad powers of the state to tax we need not look beyond the decisions of this court to ascertain the power of the legislature to classify the subject matters of taxation. This power is nowhere better expressed than in *Standard Lbr. Co.,* 112 Or at 328:

> "* * * The decisions emphasized the principle that the latitude of discretion is notably wide in the classification of subjects for purposes of taxation, and declare that the state has the right to select the differences upon which the classification shall be based and that such differences need not be clear and conspicuous. Any classification they say is permissible which has a reasonable relation to some permitted end of governmental action, and it is not necessary that the basis of the classification must be deducible from the nature of the things classified; it is enough if the classification is reasonably founded within the purpose and policy of taxation, and if some real and substantial distinction is present a classification based thereon is reasonable if made with respect to the kind of property or the amount or value of the property or the character of the taxpayers subjected to the tax."

And see the valuable contribution to the subject of classification found in Etter, Municipal Tax Differentials, 1957, 37 Ore L Rev 1, beginning at page 39. One of the bases for valid classification expressed by Mr. Etter has particular application to this case:

> "Repeatedly persons and property have been classified for purposes of taxation on the basis of public policy. 'A discrimination is not arbitrary, of course, where based on sound reasons of

public policy.'* In Connecticut, for example, a tax classification based on the public policy of encouraging the development of forests has been upheld.* In Iowa, a classification for the purpose of encouraging agriculture has been upheld.* In Minnesota, a classification for the purpose of encouraging resident home ownership has been upheld.*" 37 Ore L Rev 42. (Footnotes omitted)

Decision in this case is also aided by reference to another authority that is of more than usual persuasion in attempting to define the limits of the taxing power of the Oregon Assembly. That is the work of Newhouse, Constitutional Uniformity & Equality in State Taxation, 1959. The latter is a study of the provisions of each of the state constitutions in respect to the uniformity problems in taxation and of the decisions of each of the state courts interpreting these constitutional requirements. Professor Newhouse not only considers the nature of the constitutional requirements as interpreted by court decision in each state but also makes an exhaustive comparative analysis of the differing powers to tax thereby found to repose in the several state legislatures. There is also an extensive study of the judicial decisions as they have tested the acts of the states against the 14th Amendment. In respect to the taxing power of the legislature granted by the Oregon Constitution, as interpreted by this court, in comparison to the power granted the legislature of other states, Professor Newhouse has reached these conclusions:

"* * * For example, in Minnesota, Oregon, and Pennsylvania, the courts have permitted the legislatures the greatest degree of discretion for the purpose of classifying property for effective rates, including the subclassification of real property as well as other extensive classifications." Newhouse,

Constitutional Uniformity and Equality in State Taxation, (1959), at page 553.

"* * * The remaining four states in this group (Delaware, Minnesota, Oklahoma, and Oregon) have no ad valorem requirement.* In the constitutions of those states there are no supplementary provisions. It is also pertinent to note that they are among the most liberal of the states in discretion allowed the respective legislatures in taxation of property." Newhouse, Constitutional Uniformity and Equality in State Taxation, (1959), at page 673. (Footnote omitted)

It is realized that these conclusions carry persuasion only. But a conclusion based upon so complete a study, one unequaled in modern times, and based upon the comparative analysis made, must be given a preferred deference.

Thus far it appears that the lands classified as being subject to the challenged tax have this in common: They are lands which contain "* * * forested land, woodland, brushland, cutover land or clearing * * *" as distinguished from lands given over to cultivation or other non-forested lands. And they are lands "* * * which, during any time of the year, contain enough inflammable forest growth or debris to constitute a fire hazard." Further, they are forest lands in Eastern Oregon in contrast to forest lands in Western Oregon which have been separately classified and differently taxed. The lands brought within this classification will not be, in many instances, readily identifiable and some inequality is likely to occur. That does not make the classification bad. "We must consider its general application to the classes affected, and not to certain individuals belonging to such classes. Exact equality is not possible. Practical equality is constitutional equality. The human mind has not yet

been able to devise any scheme of taxation which will operate with unerring certainty and equality to all situations that may arise." *State v. Kozer,* 1926, 116 Or 581, 591, 242 P 621, 624. And see *Allied Stores of Ohio v. Bowers,* 358 US at 527. The policy reasons for the classification are apparent and the need for fire protection cannot be challenged. The classification made by the statutes meets the tests of reasonableness.

Having made a reasonable classification of forest lands, which for the purposes intended had characteristics in common, was it constitutionally bad for the legislature to tax these forest lands without regard to the value of the land? I think not. In reaching that conclusion it is not necessary to now decide if the legislature could tax land for any purpose without respect to value. But the purpose here was fire protection and fire protection does not necessarily have any relationship to the value of the land. Land of little value could, at any given time, provide a greater fire hazard than land of greater value. Neither is the cost of fighting fire correlated to the value of the land. It cannot be said that the tax is excessive or confiscatory. If that were so it would present a different case. There is no hostile discrimination. These are some of the conceivable causes that could have prompted the legislature to adopt this statute. The causes are reasonable. They serve the policy expressed and intended. *Pacific Express Co. v. Seibert,* 1892, 142 US 339, 12 S Ct 250, 35 L Ed 1035; *Allied Stores of Ohio v. Bowers,* 358 US 522. The legislature has made valid provisions to solve a problem not easy of solution. The wisdom of the solution is not for a court to judge. *Walter v. City of St. Louis,* 1954, 347 US 231, 237, 74 S Ct 505, 98 L Ed 660. It does not violate the

cited sections of the constitution and that is the limit of our inquiry.

The parties and the majority have attempted to place this tax in a particular category of taxation and to then test it as a property tax, or a privilege tax, or a regulatory tax or as a special assessment. The legislature is not constitutionally inhibited from adopting a tax that does not fall within the definition of any of the more common methods of exacting taxes. This tax has some of the characteristics of each of the types of taxes mentioned.

I believe the tax more nearly approaches a property tax than any of the other forms of taxation mentioned. And, for the reasons before stated, if it is treated as a property tax it does not conflict with the constitutional limitations.