Argued and submitted January 12, affirmed July 7, petition for review denied December 7, 1999 (329 Or 528)

SCAPPOOSE SAND AND GRAVEL, INC.,
an Oregon corporation,
*Appellant,*

*v.*

COLUMBIA COUNTY,
a municipal corporation,
*Respondent.*

(922141; CA A99356)

984 P2d 876

Leslie M. Roberts argued the cause for appellant. With her on the briefs was Josselson, Potter & Roberts.

Michael J. Lilly argued the cause and filed the briefs for respondent.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

DE MUNIZ, P. J.

**DE MUNIZ, P. J.**

In October 1992, plaintiff brought this action for declaratory and injunctive relief against defendant Columbia County challenging the validity of Ordinance 92-8, which the county enacted in September 1992 to amend the fee provisions of its Surface Mining Ordinance. Plaintiff contends that the two-cent per ton "regulatory fee" that the 1992 ordinance imposes on plaintiff and others engaged in surface mining is a "tax" and that, therefore, the county was required to, but did not, submit it to the voters pursuant to ORS 203.055.[1] Plaintiff also maintains that the ordinance is invalid because the county's surface mining regulations are preempted by state law. The trial court rejected both of plaintiff's contentions and entered judgment for the county. Plaintiff appeals, and we affirm.

In June 1972, the county adopted an eight-page ordinance entitled the 1972 Surface Mining Land Reclamation Ordinance. The previous year, the state legislature had adopted Oregon Laws 1971, chapter 719, which took effect on July 1, 1972, and which contained detailed regulations of surface mining that have been made even more comprehensive through amendments at subsequent legislative sessions. Section 16 of the 1971 act expressly preempted local legislation, subject to a grandfather clause. As later amended and as now codified at ORS 517.780(1), that section provides, in material part:

> "The provisions of ORS 517.702 to 517.989 and the rules and regulations adopted thereunder shall not supersede any zoning laws or ordinances in effect on July 1, 1972; however, if such zoning laws or ordinances are repealed on or after July 1, 1972, the provisions of ORS 517.702 to 517.989 and the rules and regulations adopted thereunder shall be controlling."

There is no dispute that the 1972 county ordinance had "grandfathered" status under that statute—although it could

---

[1] Under that statute, any ordinance of a nonhome rule county "imposing, or providing an exemption from, taxation shall receive the approval of the electors of the county before taking effect."

be said that the ordinance became a grandfather almost simultaneously with its own birth.

In 1990, the county enacted an ordinance approximately 58 pages in length that "amended" the 1972 ordinance. Although, as we will discuss later, the effect and import of the 1990 enactment contributes to the controversy here, the immediate object of the challenge in this case is Ordinance 92-8. It was enacted by the county's governing body two years later and amended *only* the fee provision contained in section 5.2 of the 1990 ordinance. As relevant here, the 1992 amendment added the following provisions to section 5.2:

"(2)(a)   In addition to the fees stated above, each landowner or operator holding a Limited Exemption Certificate or operating permit shall pay a regulatory fee to Columbia County. The regulatory fees collected in fiscal year 1992-93 shall be deposited into an account within the general fund of Columbia County dedicated to the regulation of surface mining in Columbia County. The regulatory fees collected beginning fiscal year 1993-94 and thereafter shall be deposited into a special fund of Columbia County dedicated to the regulation of surface mining in Columbia County. The regulatory fees shall not be used for any other purpose. Legitimate expenses for the use of such regulatory fees shall include the salary of the Administrator, necessary staff, secretarial and clerical support, and the vehicles, supplies and equipment involved in the regulation of surface mining in Columbia County. Such legitimate expenses shall also include such other expenses incurred by the County in the regulation of surface mining.

"(b)   Beginning October 1, 1992, and through June 30, 1993, the regulatory fee shall be in the amount of two cents ($0.02) per ton for all minerals removed from each surface mining site. During the preparation of the County's budget for fiscal year 1993-94, and each fiscal year thereafter, an accounting shall be made of the expenses incurred and revenues received by the County as a result of its regulation of surface mining. If it is determined that the revenues received, and expected to be received, are insufficient to reimburse the County for the expenses incurred, and expected to be incurred, the regulatory fee may be increased accordingly. If it is determined that the revenues received, and expected to be received, exceed the expenses incurred,

and expected to be incurred, the regulatory fee shall be decreased accordingly."

One further fact that is relevant both to the substance of our discussion and to the background that may aid our readers' understanding is that this action was consolidated at the trial court level with one that was also brought shortly after the passage of Ordinance 92-8 by another business involved in surface mining activities in Columbia County. However, unlike plaintiff here, the plaintiff in the consolidated action also appealed the enactment of the ordinance to the Land Use Board of Appeals (LUBA). The LUBA proceeding culminated in two decisions by that body, each of which was reviewed in turn by this court. *Oregon City Leasing, Inc. v. Columbia County*, 25 Or LUBA 129, *rev'd* 121 Or App 173, 854 P2d 495, *on remand* 26 Or LUBA 203 (1993), *aff'd* 126 Or App 314, 868 P2d 1372, *rev den* 318 Or 661 (1994).[2] The ultimate result of that appeal was an affirmance of the enactment in all respects except one that is not material here.

■ In this appeal, plaintiff advances two assignments of error that, respectively, challenge the trial court's rejection of its two contentions that we have summarized. The threshold question, however, is presented by the county's cross-assignment of error that the circuit court lacked subject matter jurisdiction over the action. According to the county, its Surface Mining Ordinance is a "land use regulation"; an amendment to a land use regulation, as Ordinance 92-8 is, is a "land use decision" by statutory definition; and, therefore, any dispute concerning the 1992 ordinance comes within LUBA's exclusive jurisdiction to review land use decisions. ORS 197.015(10)(a)(A)(iii), (11); ORS 197.825(1). In its first consideration of the appeal in *Oregon City Leasing*, LUBA held that the enactment of the ordinance was a land use decision over which it had jurisdiction for essentially the same reasons that the county offers here for contending that the circuit court lacked jurisdiction. *See* 25 Or LUBA at 131-32. Although we did not specifically address that issue in our

---

[2] Among the things that this fact helps explain is why we are now dealing with a case that was filed in 1992. Plaintiff apprises us that the consolidated circuit court actions were stayed pending the resolution of the LUBA proceedings.

review of LUBA's decision, the issue *is* jurisdictional, and LUBA's entire decision was before us. It is implicit that we agreed at least with the *conclusion* that LUBA had jurisdiction.[3] As the parties appear to agree, however, plaintiff was not a party to the LUBA proceeding, and the jurisdictional holding in *Oregon City Leasing* is neither the law of *this* case nor preclusive. We nevertheless conclude that LUBA was correct in its holding that it had jurisdiction, for the reasons it stated.

■ In our view, however, that is not the end of the jurisdictional inquiry here. Although Ordinance 92-8 *is* an amendment to a land use regulation, it is *also* an ordinance that, in practical effect, does nothing except impose the fees that plaintiff challenges and contends constitute a tax.[4] The declaratory judgment process has traditionally been available as a vehicle for determining the validity of local legislation, including local tax measures. ORS 28.020; *see Budget Rent-a-Car v. Multnomah Co.*, 287 Or 93, 597 P2d 1232 (1979); *Advance Resorts of America, Inc. v. City of Wheeler*, 141 Or App 166, 917 P2d 61, *rev den* 324 Or 322 (1996). There is no question that this action comes within the circuit court's jurisdiction under ORS chapter 28 if the subject matter is not confined to LUBA's exclusive jurisdiction under ORS 197.825.

In far more instances than not, it is not difficult to discern whether a local enactment is a land use regulation or something else. Where that is not the case, the reason is usually not that it is hard to tell whether the legislation deals with land use *or* something else but that it affects land use *and* something else. In *Fence v. Jackson County*, 135 Or App 574, 900 P2d 524 (1995), we adverted to the jurisdictional

---

[3] As discussed below, we reversed LUBA's decision on different grounds that went to the merits.

[4] Whether plaintiff's contention is correct is, of course, the principal issue on the merits. Under the view we take, it is not critical to the *jurisdictional* determination here whether plaintiff is or is not correct in characterizing the fees that the ordinance establishes as a "tax." *But see Springer v. LCDC*, 111 Or App 262, 826 P2d 54, *rev den* 313 Or 354 (1992); *Housing Council v. City of Lake Oswego*, 48 Or App 525, 617 P2d 655 (1980), *rev dismissed* 291 Or 878, 635 P2d 647 (1981) (holding in different procedural contexts that certain types of tax-related actions are not reviewable for compliance with statewide planning goals). *Compare City of Pendleton v. Kerns*, 56 Or App 818, 823, 643 P2d 658, *aff'd* 294 Or 126, 653 P2d 992 (1992).

problem that can arise in identifying the proper forum for adjudicating the validity of local legislation that has some attributes of a "land use regulation" and some that relate to a different regulatory objective. We said, in holding that LUBA had jurisdiction to review the county's "outdoor mass gathering" ordinance for consistency with ORS 433.735 *et seq.*:

> "The threshold issue that the parties dispute is whether LUBA had jurisdiction over the appeal. The county maintains that LUBA did not have jurisdiction over some of the issues, at least, because they pertain to regulation of matters unrelated to land use, and are therefore not 'land use decisions.' We agree with the county that the fact that a regulation is embodied in something called a land use ordinance does not convert it into a land use regulation, subject to LUBA's review, if the substance of the regulation clearly pertains to something other than land use. However, that is not the case here. Under ORS 433.763, permits for gatherings of more than 120 hours duration are to be issued by county planning commissions, upon determinations, *inter alia*, that the proposed gathering '[i]s compatible with existing land uses' and '[d]oes not materially alter the stability of the overall land use pattern of the area.' It is true that the regulations also apply to several matters *in addition* to land use. However, we are aware of nothing that requires a county to divide its regulations of a particular matter among different ordinances that variously seem best to accord with specific subjects that are embraced within the general topic. Similarly, if the result is avoidable, a person challenging the enactment should not have to proceed in different forums that have different specific subject matter jurisdiction. The regulations in question here have a significant nexus with land use. The county was free to and did regulate mass gatherings through its land use ordinance, and LUBA had jurisdiction." 135 Or App at 577 (emphasis in original).

Similar problems would have been present in *Fence* if the question had come from the opposite direction, *i.e.,* if the county had not chosen to regulate mass gatherings through an ordinance with the words "land use" in its description and if the petitioner had challenged the regulations in a circuit court declaratory judgment proceeding notwithstanding their land use ramifications. Arguably, the logical solution to those problems should have been the mirror

image of our solution in *Fence, i.e.,* the county was free *not* to embody the mass gathering regulations in a land use ordinance, and the petitioner was free to pursue a remedy in a forum other than LUBA.

■■  Although LUBA has exclusive jurisdiction to review the adoption of amendments to "land use regulations," not all enactments that come within the definition of that term deal exclusively with land use. Moreover, there is authority that supports the proposition that the jurisdictional lines are not as rigid as the county supposes them to be and that subject matter jurisdiction can be allocated consistently with the reality that the topics and effects of particular local legislation can implicate more than one subject.[5] Under *Dunn v. City of Redmond,* 303 Or 201, 735 P2d 609 (1987), and *Springer v. City of Bend,* 111 Or App 136, 826 P2d 1, *rev den* 313 Or 354 (1992), a party who asserts that a land use decision and/or regulation gives rise to a regulatory taking may effectively choose to invoke either LUBA's authority to invalidate the land use decision *per se* or the circuit court's authority to provide an inverse condemnation remedy for the resulting taking. *See also Boise Cascade Corp. v. Board of Forestry,* 325 Or 185, 935 P2d 411 (1997); *Nelson v. City of Lake Oswego,* 126 Or App 416, 869 P2d 350 (1994). The necessary, if unspoken, premise of *Dunn* is that a local action that could fall within LUBA's jurisdiction as a "land use decision" could also possess the characteristics of something else—a "compensable taking"—for which a judicial remedy traditionally has been and remains available.

In our view, the situation here is comparable. Ordinance 92-8 amends a land use regulation and, as such, is a land use decision. However, under plaintiff's allegations, the 1992 ordinance also imposes a tax or a fee that is invalid for reasons apart from any direct bearing that the ordinance has as a regulation of land use. We conclude that, under the circumstances of this case, plaintiff's allegations come within the declaratory judgment jurisdiction of the circuit court.[6]

---

[5] We use the word "subject" here, as we did in *Fence,* in the general sense and not in any sense that is related to "single subject" limitations on legislative or ballot measures.

[6] We emphasize that this opinion does not sanction or give *carte blanche* to forum shopping. As we have observed in the text, it is generally not difficult to

■        We turn to the merits. We agree with the county that, under the logic of *Sproul v. State Tax Com.*, 234 Or 579, 383 P2d 754 (1963), and *Dennehy v. Dept. of Rev.*, 305 Or 595, 756 P2d 13 (1988), the regulatory fee imposed by the ordinance is not a "tax" and, therefore, it is not subject to the voter approval requirement of ORS 203.055. The plaintiff in *Sproul* contended that a one-cent-per-acre levy for forest fire protection on certain lands that were at particular risk violated Article I, section 32, the uniformity of taxation provision of the state constitution. In *Dennehy*, the plaintiff asserted that the tax limitations of Article XI, section 11, were contravened by a statutory "tax increment" scheme for financing urban renewal programs with tax revenues that would exceed the amounts that the levying bodies could permissibly collect for general governmental purposes.

        The Supreme Court rejected the challenges in both cases. In *Sproul*, the court noted that special assessments for improvements, such as sewers, had traditionally been "deemed to be a part of the exercise of the police power and not of the power of taxation." *Id*. at 591. It then recognized that the fire protection levy was not identical to such special assessments, but it held that the two were analogous and that the same conclusion followed in both instances. The court explained:

> "It is analogous by illustrating that when certain property necessitates or makes it desirable for the state to exercise its police power, that property can be required to pay for the cost of that exercise of the police power and the constitutional limitations upon the power of taxation are not applicable. If all the people of the state, or all the property in it, are required to pay the costs of the state's exercise of the police power, the constitutional limitations on taxation must be satisfied. When the cost is to be paid only by the persons or property causing the exercise of the police power, such limitations are irrelevant." *Id*. at 592-93.

---

determine whether a local enactment is a land use regulation or something else. The jurisdictional flexibility that we recognize here exists only in the most marginal situations, and few situations can legitimately be located at the margins between land use regulation and regulation of other kinds. To illustrate, our holding on the jurisdictional question in this case *might* have differed if the 1992 ordinance had amended the Surface Mining Ordinance in any way other than or in addition to revising its fee provisions.

In *Dennehy*, the court quoted the foregoing passage from *Sproul* and said, "Leaving aside the 'police power' label, the analysis applies here." 305 Or at 605.[7] The court concluded:

> "Urban renewal financing is not a single, statewide tax to fund public structures or services unrelated to the source of the funding. Urban renewal projects are undertaken by local authorities to deal with conditions that blight both the immediately affected area and the surrounding community. * * * Tax increment financing places the cost of urban renewal on the property that benefits from the expenditure of the funds so raised. Under the reasoning of *Sproul v. State Tax Com., supra,* and [cases of similar import] * * * ORS 457.440 does not contravene the constitution's rules limiting property taxation." *Id.* at 605-06 (quotation and citation omitted).

Plaintiff cites the footnote in *Dennehy* and the aside in its text that criticize the use of the term "police power" and argues from that that *Dennehy* reflects a fundamental repudiation of or departure from the analysis in *Sproul*. We disagree. The court in *Dennehy* made quite clear that its problem with *Sproul* did not go beyond the "police power" label and that the underlying rationale of *Sproul* not only remained viable but was dispositive in *Dennehy* itself. Whatever terminology the court might have chosen, the clear effect of both *Sproul* and *Dennehy* is that an imposition is not a "tax" for purposes of the constitutional provisions if, like a special assessment and unlike a general revenue measure that funds governmental activities for the general population, it serves the peculiar needs of or is responsive to regulatory needs that are occasioned by those on whom it falls.

For the same essential reasons, plaintiff's reliance on *Haugen v. Gleason et al.,* 226 Or 99, 359 P2d 108 (1961),

---

[7] In a footnote earlier in *Dennehy*, the court explained its problem with the words "police power":

"The term describes some types of legislative purposes, not a source of power; the legal issue is whether a law imposes a 'tax' within the meaning of constitutional rules governing taxation, not whether the law is an exercise of some other 'power.' " *Id.* at 604 n 3.

does not assist it. The court there invalidated a putative subdivision approval fee imposed by Multnomah County. However, the reason for the court's decision was that,

> "[s]ince the ordinance contains nothing to relate the money, or its expenditure, to the land being subdivided, the result is that the money will become part of the public funds of the county or the school district as the case may be." *Id.* at 105.

Hence, *Haugen* does not state the opposite of what *Sproul* and *Dennehy* do; it applies precisely the same test that they apply but holds that the specific imposition in question there flunked the test that the impositions in the two later cases passed.[8]

However, plaintiff also contends that, as in *Haugen*, the county's fee and the underlying regulations it funds are not confined to surface mining activities or to the benefit of those involved in them. Insofar as plaintiff's premise is that, in order for an imposition to be something other than a "tax" under the relevant case law, there must be a direct "benefit" for the persons assessed, in the sense of an enhancement of property values or some other affirmative reward, we disagree. The reasoning of *Sproul* applies equally to persons who have statuses or engage in activities that give rise to the regulatory need, whether or not the regulation directly "benefits" them or their property in the broad colloquial sense of the word. Aside from the particulars of plaintiff's argument that depend on that premise, it consists of random examples of ways in which the fee may be spent—*e.g.*, "requirements for parking" at mining sites—that plaintiff regards as lacking the requisite connection with surface mining to make the fee anything other than a general tax. It suffices to say that we do not agree that that example or the others that plaintiff gives demonstrate a lack of the necessary connection to surface mining to bring the fee within the *Sproul* and *Dennehy* rationale.

Plaintiff also emphasizes that our responsibility here is to construe ORS 203.055 in accordance with the Supreme Court's methodology in *PGE v. Bureau of Labor*

---

[8] Because of intervening changes in state law that are not material here, the holding in *Haugen* might not be the same today.

*and Industries*, 317 Or 606, 859 P2d 1143 (1993). Plaintiff *suggests* that prior Supreme Court interpretations of terms such as "tax" and "taxation," like those in *Sproul* and *Dennehy*, might not survive scrutiny under the *PGE* rubric. Plaintiff contends that, for purposes of the *PGE* analysis, "taxation" is a "word of common usage" that should be given its "plain, natural and ordinary meaning" as derived from dictionary definitions. Considering the voluminous amount of literature—not to mention governmental agencies and private entities—that are devoted to the subject, it is not at all evident to us that the meaning of "taxation" and related terminology in a particular statute can be greatly illuminated by standard dictionary definitions. As plaintiff correctly notes, in *Automobile Club v. State of Oregon*, 314 Or 479, 485, 840 P2d 674 (1992), the Supreme Court turned to a dictionary to assist it in discerning the meaning of the terms "tax" and "assessment." However, on the following page of its opinion, the court indicated that the import and application of the terms vary from one context to another and that their meaning in any particular context is ascertainable largely by reference to the purposes of the provisions in which they are used or to which they are applied. *Id.* at 486.

We nevertheless agree with plaintiff that the *PGE* methodology is applicable. At the textual level, the word "taxation" in ORS 203.055 is the same or an analog of the word that the Supreme Court has interpreted and has juxtaposed with "assessments" and related terms in *Sproul, Dennehy* and related opinions. Similarly, although plaintiff disagrees, we find and plaintiff directs us to no context for the term that is more relevant than those opinions and the terminology in the provisions that those opinions construe.[9] In fact, this case is logically inseparable from *Sproul*. In both, the imposition was occasioned by a particular regulatory need, it funds the regulatory purpose, and it falls on those whose circumstances or activities give rise to the need. Here, as in *Sproul*, the

---

[9] Plaintiff asserts that, were it to be reached, the legislative history would not prove helpful. Plaintiff apprises us that the principal legislative history was the testimony of a witness who "assured the legislative committees that case law gave adequate content to the term 'taxation,' to assure it encompassed all sorts of exactions intended to require a vote." We do not find it necessary to reach the legislative history.

imposition is not a tax, and it is not subject to the voter approval requirement of ORS 203.055.[10] Consequently, we reject plaintiff's first assignment of error.

■ In its second assignment, plaintiff contends that the trial court erred in rejecting its preemption argument. Specifically, plaintiff argued to the trial court and argues here that the extensive 1990 ordinance was a repeal of rather than an amendment to the county's 1972 ordinance. Therefore, according to plaintiff, the county regulations have been supplanted by the state statutes pursuant to ORS 517.780(1). In *Oregon City Leasing*, we addressed the same question and remanded it to LUBA for further consideration. 121 Or App at 178. On remand, LUBA held that, under the test we had formulated in our opinion, enough of the county's 1972 ordinance survived the 1990 ordinance so that the latter did not "repeal" the former within the meaning of ORS 517.780. 26 Or LUBA at 206-07. Therefore, the underlying county regulations and the fee that Ordinance 92-8 assesses in conjunction with them remained effective and were not preempted by the state statutes. We agree with LUBA's conclusion in *Oregon City Leasing* and with the trial court's conclusion here.

Affirmed.

---

[10] Plaintiff's suggestion that *Sproul* was wrongly decided or does not survive *PGE* presents no question for *this* court to decide.