Argued and submitted October 7, 1987, decision of Tax Court affirmed in part and reversed in part and remanded to Tax Court for further proceedings May 17, 1988

# DENNEHY,
*Appellant,*

*v.*

# DEPARTMENT OF REVENUE,
*Respondent.*

## (TC 2395; SC S33695)

756 P2d 13

Gregory J. Howe, Portland, appeared and filed a brief on behalf of appellant.

Marilyn J. Harbur, Assistant Attorney General, Salem, appeared and filed a brief on behalf of respondent. With her on the brief was Dave Frohnmayer, Attorney General, Salem.

John W. Osburn, Miller, Nash, Wiener, Hager & Carlsen, Portland, filed an *amicus curiae* brief on behalf of Portland, Beaverton, North Clackamas, and Tigard School Districts.

Howard A. Rankin and Katherine G. Georges, Rankin, Vav Rosky, Doherty, Maccoll & Mersereau, Portland, and Oliver I. Norville, Norville & Hiefield, Portland, filed an *amicus curiae* brief on behalf of the League of Oregon Cities, City of Gresham, and the following urban renewal agencies: Albany Redevelopment Agency, Beaverton Urban Renewal Agency, Clackamas County Development Agency, Coos County Urban Renewal Agency, Eugene Renewal Agency, Lake Oswego

Redevelopment Agency, Newport Development Commission, Portland Development Commission, Seaside Improvement Commission, Tualatin Development Commission, and Urban Renewal Agency of the City of Salem.

LINDE, J.

## LINDE, J.

Since 1916, the power of the state and other taxing units to raise revenue has been limited according to a formula spelled out in the Oregon Constitution. Following a constitutional amendment adopted in 1960, the Legislative Assembly enacted laws for financing urban renewal projects by using ad valorem taxes on the increase of property values in a redeveloped area to pay expenditures incurred for the project. Plaintiff, a resident and property owner in Multnomah County, appealed the assessment of taxes against his property to the Department of Revenue on grounds that the collection of taxes pursuant to the assessment would exceed constitutional and statutory limitations. Obtaining no relief from the Department, plaintiff filed his complaint in the Oregon Tax Court. The Tax Court granted the Department's motion for summary judgment in an opinion which the court amended on rehearing. *Dennehy v. Dept. of Rev.*, 10 OTR 348 (1987).

### I.

The basic theory of so-called "tax increment financing" of urban renewal indebtedness (the caption provided in codifying ORS 457.420 to 457.460) is simple, though its administration can be complex.

The ordinary process of taxing real property in Oregon is that taxing units[1] (each county, city, or special district) report to the county assessor the revenue to be raised for that unit. ORS 310.060. The assessor then calculates a rate of levy for each taxing unit based on the assessment value of taxable property in that unit. ORS 310.090. The rate, the fraction of the total taxable property value required to raise the revenue designated by the several taxing units, is applied to the assessment value of each piece of taxable property so as to fix the tax on that property.

Tax increment financing is designed to pay for urban renewal projects by segregating the added property values attributed to urban renewal and devoting the property taxes on this incremental value to paying the costs of the projects.

---

[1] The legal texts involved variously use the terms "taxing unit," Oregon Constitution, Article IX, section 1c, Article XI, section 11, "taxing body," ORS 457.440, or "tax-levying body," ORS 310.060. The terms also include the state when it levies a property tax.

The procedure is set out in ORS chapter 457. The county assessor certifies the true cash value of the property in the urban renewal area on the effective date of the ordinance approving the renewal plan. ORS 457.430. Thereafter, only this value is counted for purposes of computing the rate at which the property is taxed in order to meet the budgeted needs of the several taxing units. ORS 457.440(1). The rate so computed is applied, "extended on the assessment roll," against the actual assessed value of the property in each taxing unit, including increases in value beyond the value previously certified. ORS 457.440(2). Because this increased property value was excluded in setting the tax rate, applying the rate to the higher value will generate funds beyond the budgeted needs of the taxing bodies.

The taxes produced by applying the rate to the old property values certified under ORS 457.430 are allocated to these budgeted requirements of the taxing bodies, ORS 457.440(3); the additional taxes generated by the increase in property values in the urban renewal area are paid to the urban renewal agency "to pay the principal and interest on indebtedness incurred by the agency to finance or refinance" the agency's projects. ORS 457.440(4). The agency may irrevocably pledge these expected increased tax revenues to pay this indebtedness. ORS 457.440(6). In short, tax increment financing captures taxes generated by higher property values due to redevelopment or urban renewal expenditures for paying those expenditures, otherwise leaving the tax bases and tax rates of the several taxing units about where they would be without an urban renewal or redevelopment district.

Plaintiff does not oppose the allocation of taxes between the urban renewal agency (here the Portland Development Commission) and the several taxing units that levy the taxes, as provided in ORS 457.440(3) and (4). He maintains, however, that the directive of subsections (1) and (2) to compute a tax rate including only the certified or "frozen" value of property, which thereafter is assessed against the entire actual value of property in the taxing unit, contravenes the limits imposed by Article XI, section 11(1) of the Oregon Constitution on the amounts that the taxing units may levy without prior approval of the voters.

Article XI, section 11(1) of the Oregon Constitution provides:

"Except as provided in subsection (3) of this section, no taxing unit, whether it be the state, any county, municipality, district or other body to which the power to levy a tax has been delegated, shall in any year so exercise that power to raise a greater amount of revenue than its tax base as defined in subsection (2) of this section. The portion of any tax levied in excess of any limitation imposed by this section shall be void."

Article XI, section 11(2) provides that a tax base must be approved by the voters and can increase without a further vote by no more than six percent above the amount levied in one of the preceding three years. Section 11(3)(a) excludes from the limitation "[t]hat portion of any tax levied which is for the payment of bonded indebtedness or interest thereon."

■ Urban renewal agencies supported by tax increment financing are not themselves taxing units and have no tax bases. The essence of tax increment financing, as already stated, is that such an agency obtains the revenue generated by applying to the full value of property in the renewal area a tax rate which was calculated to meet the needs of the taxing units when applied to an artificial "frozen" value of the property. Local taxing units ordinarily levy taxes at or above their respective tax bases; if the unit needs less for three consecutive years, the base drops by virtue of Article XI, section 11(2). Plaintiff therefore contends that the additional revenue generated by tax increment financing exceeds the tax bases of the respective taxing units containing an urban renewal area without having been approved by the voters.

Article IX, section 1c, of the Oregon Constitution provides:

"The Legislative Assembly may provide that the ad valorem taxes levied by any taxing unit, in which is located all or part of an area included in a redevelopment or urban renewal project, may be divided so that the taxes levied against any increase in the true cash value, as defined by law, of property in such area obtaining after the effective date of the ordinance or resolution approving the redevelopment or urban renewal plan for such area, shall be used to pay any indebtedness incurred for the redevelopment or urban renewal project. The Legislature may enact such laws as may be necessary to carry out the purposes of this section."

As the Tax Court observed, this text was taken from a California provision apparently without considering that a California taxing unit levies its tax in the form of a rate, while each Oregon taxing unit levies a total amount to be raised. ORS 457.440 is designed to produce the amounts levied by each taxing unit, but to do so from less than the actual property values by a correspondingly higher rate of levy. According to the Tax Court, this makes it impossible literally to "divide" the taxes levied by the taxing units, in the words of Article IX, section 1c, but rather adds something to the taxes levied by them, "to provide for the collection of more taxes than are levied by the taxing units in order to have funds for urban renewal." 10 OTR at 353.

The court's analysis left in question who levied these additional taxes, if they were "levied" at all, and against whose tax base they must be tested for compliance with Article XI, section 11. The Tax Court initially concluded that the taxes collected under ORS 457.440 beyond the demands of the several taxing units were, for purposes of Article XI, section 11, imposed by the state itself. "Since the court has concluded that urban renewal taxes raised by ORS 457.440 are levied by the state, it is the state's tax base that sets the limit." 10 OTR at 357-58.

That answer evoked a petition for rehearing from defendant, expressing concern that the court's theory threw doubt on urban renewal bonds, because the state had not levied a property tax for many years and might well have no tax base. Defendant instead offered the court a menu of other theories to sustain the urban renewal financing scheme, among them that the assessor's actions under ORS 457.440 are not part of the "levy" process, that the taxes resulting from the increased property values in the urban renewal area are not "levied," because the amount is uncertain, that the sums collected are not "revenues of the state," that the sums allocated to urban renewal projects are analogous to special assessments dedicated to those projects and therefore outside the limitations of Article IX, section 11, that the additional collections are really exactions under the "police power" rather than taxes, and finally, that the special constitutional authorization of urban renewal financing in Article IX, section 1c, gives it equal status with and therefore exempts it

from Article XI, section 11. The Tax Court granted the petition and amended its opinion to reflect several theories, but mainly the analogy to special assessments dedicated to uses benefiting the assessed property. 10 OTR at 361-62.

## II.

■ ■ The Tax Court correctly held that the Legislative Assembly did not lack authority to enact ORS 457.440 despite its apparent verbal inconsistency with Article IX, section 1c. The Legislative Assembly has plenary authority to legislate within constitutional limits and did not need authorization by Article IX, section 1c, except to allay possible doubts about such limits, *see State ex rel Chapman v. Appling,* 220 Or 41, 47, 348 P2d 759 (1960), *Jory v. Martin,* 153 Or 278, 285-87, 56 P2d 1093 (1936); *King v. City of Portland,* 2 Or 146 (1865); and to the extent that Article IX, section 1c, specified how urban renewal was to be financed, its reference to "such laws as may be necessary to carry out the purposes of this section" includes laws *to fit those purposes into the existing structure of property taxation. See* 10 OTR at 354-55.

On appeal, plaintiff does not invoke Article IX, section 1c, to deny legislative authority but assigns as error the Tax Court's conclusion that the taxes earmarked for urban renewal were not subject to the limitations of Article XI, section 11. That section (quoted above) limits exercise of the power "to levy a tax" so as "to raise a greater amount of revenue" than the taxing unit's tax base without prior approval by the taxing unit's voters. The parties' arguments, as already described, dispute whether the process of funding urban renewal projects under ORS 457.440 "levies" a "tax" and raises "revenue," as those words have been analyzed in prior cases.

■ It is not necessary to pursue each argument at length. The laws for financing urban renewal projects, Article IX, section 1c of the Oregon Constitution and ORS 457.420 to 457.460, assume the use of funds generated by a "portion" of taxes "levied by" a taxing unit. They describe the source of funds in those terms. If to "levy" a tax, as distinct from "collecting" a tax, means the political decision to raise an amount of revenue from taxpayers by a specified formula, *see* Black's Law Dictionary 816 (5th ed 1979), that decision was not made by the state when it made available the statutory means of

undertaking redevelopment or urban renewal projects. It was not made by taxing units that did not participate in the decision to undertake such a project but only reported to the assessor the amount of revenue to be raised for their own budgets. If it were necessary to identify the taxing unit that made the political decision constituting the "levy" on the increased property values in the urban renewal area, it would be the governmental body that decides to create the redevelopment agency and to undertake the project with the revenue so obtained, in this case the City of Portland. ORS 457.035, 457.045, 457.095.

The Tax Court correctly concluded, however, that the tax revenues obtained from the increase of property values in the urban renewal area, by whomever levied, were akin to special assessments for the benefit of the property in that area, to which Article XI, section 11, has been held not to apply. This was understood when Article XI, section 11, was enacted, because as early as 1865 an assessment of abutting landowners for street improvements was held not to be the kind of taxation meant by Article I, section 32, of the Constitution.[2] *King v. City of Portland, supra.* The distinction between "general" taxes and "assessments" was followed with respect to Article I, section 32, and extended also to Article XI, section 11, in *Northern Pac. Ry. Co. v. J. Day Irr. Dist.,* 106 Or 140, 211 P 781 (1923), in sustaining a special assessment of an irrigation district against attack under both provisions. About Article XI, section 11, the court wrote:

> "This constitutional provision has no application to the assessment under consideration. We have already referred to the distinction between general taxes for the support of the government or of the state and its political subdivisions, and assessments for the benefit of property. The difference existing between taxation for general governmental purposes by the state or its political subdivisions, and assessment for local improvements, was well understood by the people of the state for a period of half century [sic] prior to the adoption of the Six Per Cent Tax Limitation Amendment. See authorities

---

[2] Article I, section 32, of the Oregon Constitution then provided:

"No tax or duty shall be imposed without the consent of the people or their representatives in the legislative assembly; and all taxation shall be equal and uniform."

collected and cited in *Mayor of Birmingham v. Klein,* 89 Ala 461 (7 South. 386, 8 L. R. A. 369, 374)."

*Id.* at 164, 211 P 781. The cited Alabama opinion suggested that assessments are "not taxes, in the ordinary sense [but] in the nature of compensation for a benefit peculiar to the owner of the abutting property," whereas a "tax" is "a contribution to the general fund" for which nothing is given "which benefits him individually, as distinguished from the mass of citizens." *Mayor and Aldermen of Birmingham v. Klein, supra,* 89 Ala at 466, 7 So at 388 (1889).

The distinction thus early accepted by this court is one of function, not nomenclature, though the verbal shortcut of characterizing an exaction as "not a tax" is hard to avoid when "tax" is the operative word in the disputed law. In *Sproul v. State Tax Com.,* 234 Or 579, 383 P2d 754 (1963), plaintiffs challenged a "levy" of a one-cent-per-acre "tax" for forest fire protection of certain lands in eastern Oregon on grounds that the tax was not uniform as required by Article I, section 32, of the Constitution. Early decisions had sustained statutes imposing fire district assessments on landowners who did not themselves provide fire protection as an exercise of regulatory (or "police") power rather than taxes. *Starker v. Scott et al.,* 183 Or 10, 190 P2d 532 (1948); *First State Bank v. Kendall L. Co.,* 107 Or 1, 213 P 142 (1923).[3] The *Sproul* court observed that the previous decisions sustained "regulations" that only charged landowners for fire protection if they failed to provide protection themselves, while under the law at issue the state did not order forest landowners to do anything; it collected assessments for a fund to spread the costs that some landowners would have to bear for fire protection and suppression. 234 Or at 586-87, 383 P2d 754. *Sproul* nevertheless concluded that the assessment, though purporting to "levy" a "tax," was not a tax within the meaning of the constitutional

---

[3] *Starker v. Scott,* 183 Or 10, 15-16, 190 P2d 532 (1948), quoted 1 Cooley, Taxation § 27, for the proposition that an exaction for general purposes is a tax, and an exaction for regulatory purposes is an exercise of "the police power." We disapprove the terminology insofar as it suggests that "police power" is anything other than the general plenary power to legislate, *see State ex rel Chapman v. Appling,* 220 Or 41, 348 P2d 759 (1960), a confusion illustrated, *e.g.,* in *State v. Fetterly,* 254 Or 47, 456 P2d 996 (1969) (discussing why motorcycle helmet law did not exceed "police power"). The term describes some types of legislative purposes, not a source of power; the legal issue is whether a law imposes a "tax" within the meaning of constitutional rules governing taxation, not whether the law is an exercise of some other "power."

limitations. *Id.* at 581, 383 P2d 754. Although the example used by the court in *dicta* is not before us, it illustrates how the court's thinking related to the present case:

> "Attempting to put this in sharper focus, the [forest assessment] statute is regarded as legally similar to a hypothetical city ordinance which finds that a certain geographical area of the city requires more police protection than other areas and the cost of this additional police protection is charged to this particular geographical area and assessed on a pro rata per-unit-of-area basis."

*Id.* The court recognized that the forest land "tax" was not a "special assessment" identical to that for streets or sewers and as such outside constitutional limitations on taxation, but it decided that the law of special assessments was "analogous":

> "It is analogous by illustrating that when certain property necessitates or makes it desirable for the state to exercise its police power, that property can be required to pay for the cost of that exercise of the police power and the constitutional limitations upon the power of taxation are not applicable. If all the people of the state, or all the property in it, are required to pay the costs of the state's exercise of the police power, the constitutional limitations on taxation must be satisfied. When the cost is to be paid only by the persons or property causing the exercise of the police power, such limitations are irrelevant."

*Id.* at 592-93, 383 P2d 754.[4] Leaving aside the "police power" label, the analysis applies here.

Urban renewal financing is not a single, statewide tax to fund public structures or services unrelated to the source of the funding. Urban renewal projects are undertaken by local authorities to deal with conditions that blight both the immediately affected area and the surrounding community. ORS 457.010, 457.020. To quote a leading opinion:

> "Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden. They may also be an ugly sore, a blight on

---

[4] An extensive concurring opinion by Justice Sloan maintained that the "tax" levied on forest landowners should indeed be recognized as a tax and nevertheless would not fail the test of uniformity. 234 Or at 603-13.

the community which robs it of charm, which makes it a place from which men turn. The misery of housing may despoil a community as an open sewer may ruin a river."

*Berman v. Parker,* 348 US 26, 32-33, 75 S Ct 98, 102, 99 L Ed 27 (1954). Tax increment financing places the cost of urban renewal on the property that benefits from the expenditure of the funds so raised. Under the reasoning of *Sproul v. State Tax Com., supra,* and *Northern Pac. Ry. Co. v. J. Day Irr. Dist., supra,* and the authorities cited in the *Sproul* opinions, ORS 457.440 does not contravene the constitution's rules limiting property taxation.

## III.

Plaintiff also contends that assessors misapply ORS 310.110 in apportioning a taxing unit's levy when the unit lies in two or more counties and in addition contains urban renewal property, and that if ORS 310.110 were correctly applied, it would violate the uniformity requirement of Article I, section 32, of the Oregon Constitution.

ORS 310.110(1) controls apportionments between counties. It provides that "the total amount of taxes levied by the district shall be apportioned * * * in the proportion that the equalized assessed value of the part of the district lying in each county bears to the equalized assessed value of the whole district." Plaintiff argues that assessors violate ORS 310.110(1) because, when a county line splits a taxing unit containing an urban renewal area, their practice is to exclude any incremental increase in value of urban renewal property from the equalized assessed property value of the taxing unit before making the apportionment.

■■ This practice is not unlawful. When ORS 457.440 excluded increments beyond the certified or "frozen" value of property from the district's reach, it also excluded it from the assessed value to be counted in apportioning the district's taxes proportionately among its taxpayers in more than one county. The requirements of that later, more specific statute became part of the directives to assessors in making their apportionment pursuant to ORS 310.110(1). There is no legal obstacle to administering ORS 310.110 consistently with the requirements of Article I, section 32.

## IV.

Plaintiff also attacks the assessor's method of computing the rate of levy that is applied to taxable property in order to raise the revenue levied by the several taxing units. ORS 310.090 provides (subject to a section not at issue here) that

> "the county assessor shall compute the rate of levy for each tax-levying body by dividing the assessed valuation into the total amount of money proposed to be raised by taxation, and the rate when so computed shall be expressed in the nearest even amount of dollars and cents, per thousand dollars of assessed value, that will produce the amount of money required to be raised."

The fraction so computed most often will not result in an "even amount of dollars and cents, per thousand dollars of assessed value," and the assessor's practice has been always to round up to the next higher number after the fifth decimal place, no matter how small the remaining fractions.

To express a rate of levy in "dollars and cents, per thousand dollars of assessed value," requires that the division of the levy by the assessed valuation must be carried to enough places to leave two digits behind the decimal point, representing the cents. For instance, if a $1,000,000 levy is to be raised from property valued at $90,000,000, the fraction would be 1/90, or .01111, a repeating decimal. Expressed as dollars and cents per thousand dollars, the fraction would be multiplied by 1000, meaning that applied to each $1000 of assessed value, the rate would be $11.111 ($1,000,000 over 90,000 thousands). The assessor, however, would round the rate up to $11.12. When the rounding-up is repeated for many overlapping taxing units and applied to each unit's total assessed valuation, the difference can be significant.

Defendant responds that assessors must round up fractions in order to "produce the amount of money required to be raised," as directed by ORS 310.090, partly because rounding down after the final cent, even if mathematically appropriate, would assess less than the levy and partly because all taxes levied are not in fact collected, and that this interpretation does not contravene Article XI, section 11. Defendant contends that the assessor's calculation of the rate of levy is not part of the "levy" but part of the "collection" of

taxes. The Tax Court accepted this argument. The court wrote:

> "It is not necessary for the court to determine whether rounding up raises revenue in excess of the amounts authorized by Article XI, section 11. Plaintiff cannot prevail on this issue because Article XI, section 11, is a limit on the amount a taxing unit may levy, not on the amount that an assessor may assess or a tax collector may collect. As indicated above the assessor's actions in computing the rate under ORS 310.090 are not part of the levy process. *School Dist. No. 1, Mult. Co. v. Bingham,* 174 Or 540, 149 P2d 963 (1944)."

10 OTR at 360. The cited case does not support the Tax Court's proposition. It held that "the extension of taxes on the tax roll is not part of the levy of the tax, but merely a step in the process of its collection." 174 Or at 547-48, 149 P2d 963. It made no such statement about the computation that translates the levy into a rate of levy. Nor did the case on which the opinion relied, *Waterhouse v. Clatsop County,* 50 Or 176, 91 P 1083 (1907). The quotation from *Waterhouse* drew the line between extension of taxes on the tax roll and assessment, apportionment or levy:

> " 'The law has always carefully distinguished between the assessment, apportionment and levy of taxes, and their collection, and the extension of the taxes upon the roll, or a copy thereof, has always been regarded as one step in the collection.' "

*School Dist. No. 1, Mult. Co. v. Bingham, supra,* at 548.

"Extension of taxes on the tax roll," that is to say, on the record listing each parcel of taxable property in the county by code area and account number, ORS 308.210 to 308.221, is a task of detailed administration. The taxes so to be extended on the tax roll, however, must be a legal application of the levy. The computation of the rate of levy by dividing the total assessed valuation into the total amount to be raised merely restates the levy as an arithmetic fraction. This step is codified in ORS 310.090, in chapter 310, headed "Levy of Taxes," with other sections governing levies, rather than in chapter 308 ("Assessment of Property for Taxation") or chapter 311 ("Collection of Property Taxes"). Under Article XI, section 11, a taxing unit's rate of levy may not be so computed as to "raise a greater amount of revenue than its tax base."

■ Defendant argues that the practice of "rounding up" a rate of levy beyond the fifth decimal place does not in fact raise revenue in excess of the levy. It asserts that taxpayer disputes, appeals, delayed payments, and uncollectable tax bills routinely cause collections to fall short of levies. But we do not agree that when Article XI, section 11(1) denied every taxing unit authority "to raise a greater amount of revenue than its tax base," it meant an empirical measure of the revenue that in fact would be collected. Defendant's argument proves too much. If the rate of levy could be adjusted to allow for undercollections, as defendant argues, the adjustment need not be limited to rounding up fractions. It equally would permit laws that increased the tax rate by whatever factor experience shows to be appropriate to adjust for undercollections.

Neither ORS 310.090 nor Article XI, section 11, contemplates such a speculative adjustment in the rate of levy. If collections in a given year miraculously proved higher than anticipated by the assessor's adjustment, they would exceed the levy and the constitutional limitation and the excess would be "void." The limitation of Article XI, section 11, is stated as a limitation on the exercise of "the power to levy a tax," that is to say, on the taxing unit's political act of deciding the levy. If the taxing unit determines that a somewhat higher levy will be needed to raise its required revenue, it must make that decision publicly in setting the levy.

The rate of levy, which determines what complying taxpayers in fact pay, is the arithmetic consequence of the levy. The words "will produce the amount of money required to be raised" in ORS 310.090 describe a calculation, not a prediction. Of course, no computation that must ignore fractional amounts will produce exactly the correct amount to the last penny, neither more nor less. Defendant interprets ORS 310.090 to put primary emphasis on reaching the permissible levy and therefore rounds all fractions up so as to raise *not less* than the levy. The constitution, however, forecloses any law that will raise (arithmetically, not empirically) *more* revenues for a taxing unit than its tax base. When any further reduction of the small remaining gap becomes impossible, the constitution must prevail. Nothing in Article XI, section 11, or ORS 310.090 leaves any discretion to adjust the computation for undercollections, by rounding up fractions or otherwise.

The Tax Court therefore erred in rejecting plaintiff's challenge to defendant's practice of rounding up minor fractions in computing the rate of levy. But we do not hold that there can be no other solution than to round down all fractions for all individual taxing units. Statutory law, not the constitution, provides the process by which levies of the several individual taxing units are cumulated for collection either before or after being translated into rates of levy. Neither the Department nor the Tax Court has fully considered whether any other ways of further reducing the gap created by fractional rates of levy are possible under the present statutes. For instance, modern computer programs may make it possible to calculate the shortfall or excess from rounding down or up and to add or subtract it proportionately in each tax bill. We do not here decide whether ORS 310.090 leaves room for such a procedure, which no one has considered below. Alternatively, the taxing authorities may prefer to recommend to the Legislative Assembly a statutory change, if necessary, that would permit carrying the rate of levy to enough decimal points so as to make the effect of any further fractions truly *de minimis,* whether or not it remains desirable also to translate the rate of levy into the nearest dollars and cents per $1,000 of assessed value for the information of the public. Nor have the Department and the Tax Court considered what disposition is required with respect to any sums in excess of permissible levies that are found to have resulted from rounding up minor fractions. We therefore remand the case for consideration of these issues.

## V.

Because the case must be remanded, we also leave to the Tax Court initial determination of the amount of attorney fees to which plaintiff is entitled.

The decision of the Tax Court is affirmed in part and reversed in part, and the case is remanded to that court for such further proceedings, including possible proceedings before the Department of Revenue, as the court deems necessary and consistent with this opinion..